# PASADENA CITY BOARD OF EDUCATION ᴇᴛ ᴀʟ. *v.* SPANGLER ᴇᴛ ᴀʟ.

No. 75–164.  Argued April 27–28, 1976—Decided June 28, 1976

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 441. STEVENS, J., took no part in the consideration or decision of the case.

*Phil C. Neal* argued the cause for petitioners. With him on the briefs were *Lee G. Paul, Peter D. Collisson, Robert G. Lane, Philip B. Kurland,* and *Alan L. Unikel.*

*Fred Okrand* argued the cause and filed a brief for respondents Spangler et al. *Solicitor General Bork* argued the cause for the United States. With him on the brief were *Assistant Attorney General Pottinger, Deputy Solicitor General Wallace,* and *Brian K. Landsberg.*\*

---

\*Briefs of *amici curiae* urging affirmance were filed by *Vilma S. Martinez* and *Morris J. Baller* for the Mexican American Legal Defense and Educational Fund; by *Nathaniel R. Jones, William L. Taylor, Paul R. Dimond, William E. Caldwell, Norman J. Chachkin, Thomas D. Barr, John W. Douglas, J. Harold Flannery, Albert E. Jenner, Jr., Milan C. Miskovsky, Whitney North Seymour,* and *Chesterfield Smith* for the National Association for the Advancement of Colored People et al.; by *Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston, Drew S. Days III,* and *Melvin Leventhal* for the N. A. A. C. P. Legal Defense and Educational Fund, Inc.; by *Ralph J. Moore, Jr., Richard M. Sharp, David Rubin, Peter T. Galiano,* and *Horace Wheatley* for the National Education Assn. et al.; and by *Nathaniel S. Colley* for the Western Regional Office, National Association for the Advancement of Colored People, et al.

*Raymond B. Witt, Jr.,* filed a brief for the Board of Education of Chattanooga, Tenn., as *amicus curiae.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

In 1968, several students in the public schools of Pasadena, Cal., joined by their parents, instituted an action in the United States District Court for the Central District of California seeking injunctive relief from allegedly unconstitutional segregation of the high schools of the Pasadena Unified School District (PUSD). This action named as defendants the Pasadena City Board of Education, which operates the PUSD, and several of its officials. Before the defendants had filed an answer, the United States moved to intervene in the case pursuant to Title IX, § 902, of the Civil Rights Act of 1964, 78 Stat. 266, 42 U. S. C. § 2000h–2. The District Court granted this motion. Later, however, the court granted defendant Board's motion to strike those portions of the United States' complaint in intervention which sought to include in the case other areas of the Pasadena public school system: the elementary schools, the junior high schools, and the special schools. This ruling was the subject of an interlocutory appeal, see 28 U. S. C. § 1292 (a)(1), to the Court of Appeals for the Ninth Circuit. That court reversed the District Court and ordered the United States' demand for systemwide relief reinstated. 415 F. 2d 1242 (1969). No further review of this decision was sought.

Following remand from this decision, the District Court held a trial on the allegations that the Pasadena school system was unconstitutionally segregated. On January 23, 1970, the court entered a judgment in which it concluded that the defendants' educational policies and procedures were violative of the Fourteenth Amendment. The court ordered the defendants "enjoined from failing to prepare and adopt a plan to correct racial imbalance at all levels in the Pasadena Unified School

District." The defendants were further ordered to submit to the District Court a plan for desegregating the Pasadena schools. In addition to requiring provisions for the assignment of staff and the construction and location of facilities, the District Court ordered that

> "[t]he plan shall provide for student assignments in such a manner that, by or before the beginning of the school year that commences in September of 1970 there shall be no school in the District, elementary or junior high or senior high school, with a majority of any minority students." 311 F. Supp. 501, 505 (1970).

The court went on to retain

> "jurisdiction of this cause in order to continue to observe and evaluate the plans and the execution of the plans of the Pasadena Unified School District in regard to the hiring, promotion, and assignment of teachers and professional staff members, the construction and location of facilities, and the assignment of students." *Ibid.*

The defendant school officials voted to comply with the District Court's decree and not to appeal. They thereupon set out to devise and submit the plan demanded by the District Court. In February the defendants submitted their proposed plan, the "Pasadena Plan," and on March 10, 1970, the District Court approved the plan, finding it "to be in conformance with the Judgment entered herein January 23, 1970." App. 96. The "Pasadena Plan" was implemented the following September, and the Pasadena schools have been under its terms ever since.

In January 1974, petitioners, successors to the original defendants in this action, filed a motion with the District Court seeking relief from the court's 1970 order. Peti-

tioners sought four changes: to have the judgment modified so as to eliminate the requirement that there be "no school in the District, elementary or junior high or senior high school, with a majority of any minority students"; to have the District Court's injunction dissolved; to have the District Court terminate its "retained jurisdiction" over the actions of the Board; or, as an alternative, to obtain approval of petitioners' proposed modifications of the "Pasadena Plan."

The District Court held hearings on these motions and, on March 1, 1974, denied them in their entirety. In an opinion filed May 3, the court discussed its reasons for refusing the relief requested by petitioners. 375 F. Supp. 1304 (1974). Petitioners appealed to the Court of Appeals for the Ninth Circuit. A divided panel of that court affirmed the District Court, 519 F. 2d 430 (1975), but all three members of the panel expressed substantial reservations about some of the District Court's actions and the implications of some portions of its orders as they bore on the future operations of the Pasadena schools. Judges Ely and Chambers were apparently satisfied that the District Judge would heed the reservations expressed in their separate opinions, however, and they were content to affirm the District Court's order and remand the case. Judge Wallace dissented from the affirmance. Because the case seemed to present issues of importance regarding the extent of a district court's authority in imposing a plan designed to achieve a unitary school system, we granted certiorari. 423 U. S. 945 (1975). We vacate the judgment of the Court of Appeals and remand the case to that court for further proceedings.

I

We must first deal with petitioners' contention that there no longer exists any case or controversy sufficient

to support our jurisdiction. Petitioners assert that all the original student plaintiffs have graduated from the Pasadena school system, and that since the District Court never certified this suit as a class action pursuant to Fed. Rule Civ. Proc. 23, the case is moot. Respondents advance several theories why it is not moot.

Counsel for the individual named respondents, the original student plaintiffs and their parents, argue that this litigation was filed as a class action, that all the parties have until now treated it as a class action, and that the failure to obtain the class certification required under Rule 23 is merely the absence of a meaningless "verbal recital" which counsel insists should have no effect on the facts of this case. But these arguments overlook the fact that the named parties whom counsel originally undertook to represent in this litigation no longer have any stake in its outcome. As to them the case is clearly moot. And while counsel may wish to represent a class of unnamed individuals still attending the Pasadena public schools who do have some substantial interest in the outcome of this litigation, there has been no certification of any such class which is or was represented by a named party to this litigation. Except for the intervention of the United States, we think this case would clearly be moot. *Sosna* v. *Iowa,* 419 U. S. 393 (1975); *Indianapolis School Comm'rs* v. *Jacobs,* 420 U. S. 128 (1975).

The case did not remain an individual private action seeking to desegregate the Pasadena schools, however. The United States intervened in this case pursuant to 42 U. S. C. § 2000h–2. That section provides that "the United States shall be entitled to the same relief as if it had instituted the action." The meaning of this provision is somewhat ambiguous, and there is little legislative history to shed any light upon the intention

of Congress. But we think the statute is properly read to authorize the United States to continue as a party plaintiff in this action, despite the disappearance of the original plaintiffs and the absence of any class certification, so long as such participation serves the statutory purpose, and that the presence of the United States as a party ensures that this case is not moot.

## II

Petitioners requested the District Court to dissolve its injunctive order requiring that there be no school in the PUSD with a majority of any minority students enrolled. The District Court refused this request, and ordered the injunction continued. The court apparently based this decision in large part upon its view that petitioners had failed properly to comply with its original order. This conclusion was in turn premised upon the fact that although the School Board had reorganized PUSD attendance patterns in conformity with the court-approved Pasadena Plan, literal compliance with the terms of the court's order had been obtained in only the initial year of the plan's operation. Following the 1970–1971 school year, black student enrollment at one Pasadena school exceeded 50% of that school's total enrollment. The next year, four Pasadena schools exceeded this 50% black enrollment figure; and at the time of the hearing on petitioners' motion some five schools, in a system of 32 regular schools, were ostensibly in violation of the District Court's "no majority of any minority" requirement. It was apparently the view of the majority of the Court of Appeals' panel that this failure to maintain literal compliance with the 1970 injunction indicated that the District Court had not abused its discretion in refusing to grant so much of petitioner's mo-

tion for modification as pertained to this aspect of the order.[1] We think this view was wrong.

We do not have before us any issue as to the validity of the District Court's original judgment, since petitioners' predecessors did not appeal from it. The District Court's conclusion that unconstitutional segregation existed in the PUSD; its decision to order a systemwide school reorganization plan based upon the guidelines which it submitted to the defendants; and the inclusion in those guidelines of the requirement that the plan contain provisions insuring that there be no majority of any minority in any Pasadena school, all became embodied in the 1970 decree. All that is now before us are the questions of whether the District Court was correct in denying relief when petitioners in 1974 sought to modify the "no majority" requirement as then interpreted by the District Court.

The meaning of this requirement, as originally established by the District Court, was apparently unclear even to the parties. In opposing the petitioners' request for relief in 1974, counsel for the original individual plaintiffs and counsel for the Government jointly stipulated that they were aware "of no violations of the Pasadena Plan up to and including the present." These

---

[1] In addition to several other factors, Judge Ely cited the fact that the defendants had been found in violation of the District Court's 1970 order as supplying evidence that the court "could rightly determine that the 'dangers' which induced the original determination of constitutional infringements in Pasadena have not diminished sufficiently to require modification or dissolution of the original Order." 519 F. 2d 430, 434 (1975). Judge Chambers, concurring in the result, relied only upon the fact that petitioners had apparently not yet complied with what he viewed as the "continuing duty to homogenize" imposed upon them by the District Court's 1970 order. Judge Chambers thought that as soon as the PUSD was brought in compliance with that order, the mandatory injunction should be terminated. *Id.*, at 440.

parties were, of course, aware that some of the Pasadena schools had "slipped out of compliance" [2] with the literal terms of the order. The stipulation was based upon the fact that the plaintiffs never understood the District Court's order to require annual reassignment of pupils in order to accommodate changing demographic residential patterns in Pasadena from year to year, as the Government candidly admits in its brief here. Brief for United States 16 n. 22.

Petitioners have argued that they never understood the injunction, or the provisions of the plan which they drafted to implement that order, to contain such a requirement either.[3] But at the hearing on petitioners' motion for relief the District Court made it clear that *its* understanding of the decree was quite different from that of the parties. In response to the arguments of petitioners' counsel, the judge stated that his 1970 order "meant to me that at least during my lifetime there would be no majority of any minority in any school in Pasadena." App. 270.

When the District Court's order in this case, as interpreted and applied by that court, is measured against what this Court said in its intervening decision in *Swann* v. *Board of Education*, 402 U. S. 1 (1971), regarding

---

[2] *Id.,* at 433 n. 3.

[3] There is some disagreement whether petitioners, or their predecessors at least, understood the District Court's order in the same manner as it was interpreted in 1974. There are some suggestions in the record that petitioners may have made some attempts to stay in compliance with the "no majority of any minority" guideline as demographic patterns in Pasadena changed. But there are no factual assessments in the record as to the understanding of the petitioners, and they have argued before us that their reading of the 1970 order was the same as that of the plaintiffs. However this factual issue might be resolved, we think petitioners were not foreclosed from challenging the District Court's decree as interpreted and applied in 1974. See *infra,* at 437–438.

the scope of the judicially created relief which might be available to remedy violations of the Fourteenth Amendment, we think the inconsistency between the two is clear. The District Court's interpretation of the order appears to contemplate the "substantive constitutional right [to a] particular degree of racial balance or mixing" which the Court in *Swann* expressly disapproved. *Id.*, at 24. It became apparent, at least by the time of the 1974 hearing, that the District Court viewed this portion of its order not merely as a "starting point in the process of shaping a remedy," which *Swann* indicated would be appropriate, *id.*, at 25, but instead as an "inflexible requirement," *ibid.*, to be applied anew each year to the school population within the attendance zone of each school.

The District Court apparently believed it had authority to impose this requirement even though subsequent changes in the racial mix in the Pasadena schools might be caused by factors for which the defendants could not be considered responsible. Whatever may have been the basis for such a belief in 1970, in *Swann* the Court cautioned that "it must be recognized that there are limits" beyond which a court may not go in seeking to dismantle a dual school system. *Id.*, at 28. These limits are in part tied to the necessity of establishing that school authorities have in some manner caused unconstitutional segregation, for "[a]bsent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis." *Ibid.* While the District Court found such a violation in 1970, and while this unappealed finding afforded a basis for its initial requirement that the defendants prepare a plan to remedy such racial segregation, its adoption of the Pasadena Plan in 1970 established a racially neutral system of student assignment in the PUSD. Having

done that, we think that in enforcing its order so as to require annual readjustment of attendance zones so that there would not be a majority of any minority in any Pasadena public school, the District Court exceeded its authority.

In so concluding, we think it important to note what this case does not involve. The "no majority of any minority" requirement with respect to attendance zones did not call for defendants to submit "step at a time" plans by definition incomplete at inception. See, e. g., *United States* v. *Montgomery Board of Education,* 395 U. S. 225 (1969). Nor did it call for a plan embodying specific revisions of the attendance zones for particular schools, as well as provisions for later appraisal of whether such discrete individual modifications had achieved the "unitary system" required by *Brown* v. *Board of Education,* 349 U. S. 294, 300 (1955). The plan approved in this case applied in general terms to all Pasadena schools, and no one contests that its implementation did "achieve a system of determining admission to the public schools on a nonracial basis," *id.,* at 300–301.

There was also no showing in this case that those post-1971 changes in the racial mix of some Pasadena schools which were focused upon by the lower courts were in any manner caused by segregative actions chargeable to the defendants. The District Court rejected petitioners' assertion that the movement was caused by so-called "white flight" traceable to the decree itself. It stated that the "trends evidenced in Pasadena closely approximate the state-wide trends in California schools, both segregated and desegregated." 375 F. Supp., at 1306. The fact that black student enrollment at 5 out of 32 of the regular Pasadena schools came to exceed 50% during the 4-year period from 1970 to 1974 apparently resulted from people randomly moving into, out of, and

around the PUSD area. This quite normal pattern of human migration resulted in some changes in the demographics of Pasadena's residential patterns, with resultant shifts in the racial makeup of some of the schools. But as these shifts were not attributed to any segregative actions on the part of the petitioners, we think this case comes squarely within the sort of situation foreseen in *Swann:*

> "It does not follow that the communities served by [unitary] systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system." 402 U. S., at 31–32.

It may well be that petitioners have not yet totally achieved the unitary system contemplated by this quotation from *Swann.* There has been, for example, dispute as to the petitioners' compliance with those portions of the plan specifying procedures for hiring and promoting teachers and administrators. See 384 F. Supp. 846 (1974), vacated, 537 F. 2d 1031 (1976). But that does not undercut the force of the principle underlying the quoted language from *Swann.* In this case the District Court approved a plan designed to obtain racial neutrality in the attendance of students at Pasadena's public schools. No one disputes that the initial implementation of this plan accomplished *that* objective. That being the case, the District Court was not entitled to require the PUSD to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity. For hav-

ing once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns.

At least one of the judges of the Court of Appeals expressed the view that while all of the petitioners' contentions which we have discussed might be sound, they were barred from asserting them by their predecessors' failure to appeal from the 1970 decree of the District Court.[4] But this observation overlooks well-established rules governing modification of even a final decree entered by a court of equity. See *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421 (1856); *United States* v. *Swift & Co.,* 286 U. S. 106 (1932); *System Federation* v. *Wright,* 364 U. S. 642 (1961). In the latter case this Court said:

> "There is also no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen. The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *Id.,* at 647.

Even had the District Court's decree been unambiguous and clearly understood by the parties to mean what that court declared it to mean in 1974, the "no majority of any minority" provision would, as we have indicated

---

[4] See 519 F. 2d, at 440 (opinion of Chambers, J.); cf. n. 1, *supra.*

previously, be contrary to the intervening decision of this Court in *Swann, supra.* The ambiguity of the provision itself, and the fact that the parties to the decree interpreted it in a manner contrary to the interpretation ultimately placed upon it by the District Court, is an added factor in support of modification. The two factors taken together make a sufficiently compelling case so that such modification should have been ordered by the District Court. *System Federation* v. *Wright, supra.*

There is little real dispute among the parties with our observations thus far.[5] Indeed, as the Government points out, each of the judges of the Court of Appeals disapproved both the District Court's statement regarding its lifetime commitment to the "no majority of any minority" rule and the substance of that rule itself, to the extent that either indicated a continuing, rigid insistence upon some particular degree of racial balance. Brief for United States 37. The Government adds that these disapprovals were, in its view, quite proper, and it concludes they were sufficient to remove the "no majority of any minority" requirement from this case.

It is here that we disagree with the Government. Violation of an injunctive decree such as that issued by the District Court in this case can result in punishment for contempt in the form of either a fine or imprisonment. Federal Rule Civ. Proc. 65 (d) concomitantly provides that "[e]very order granting an injunction and every re-

---

[5] Counsel for the original plaintiffs has urged, in the courts below and before us, that the District Court's perpetual "no majority of any minority" requirement was valid and consistent wtih *Swann*, at least until the school system achieved "unitary" status in all other respects such as the hiring and promoting of teachers and administrators. Since we have concluded that the case is moot with regard to these plaintiffs, these arguments are not properly before us. It should be clear from what we have said that they have little substance.

straining order shall . . . be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . ." Because of the rightly serious view courts have traditionally taken of violations of injunctive orders, and because of the severity of punishment which may be imposed for such violation, such orders must in compliance with Rule 65 be specific and reasonably detailed.

Because of related concern that outstanding injunctive orders of courts be obeyed until modified or reversed by a court having the authority to do so, this Court has held that even though the constitutionality of the Act under which the injunction issued is challenged, disobedience of such an outstanding order of a federal court subjects the violator to contempt even though his constitutional claim might be later upheld. *United States* v. *Mine Workers,* 330 U. S. 258 (1947). The Court has likewise held that a State is constitutionally free to adopt a similar rule respecting punishment as contempt of violation of injunctive orders issued by its courts. *Walker* v. *City of Birmingham,* 388 U. S. 307 (1967). In both of these cases this Court quoted its own statement in the earlier decision of *Howat* v. *Kansas,* 258 U. S. 181 (1922):

> "It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished." *Id.,* at 190.

There is necessarily a counterpart to this well-established insistence that those who are subject to the commands of an injunctive order must obey those commands, notwithstanding eminently reasonable and

proper objections to the order, until it is modified or reversed. That counterpart is that when such persons heed this well-established rule and prosecute their remedy first by a motion to modify in the issuing court and then, failing there, by appeal of that court's denial of their motion, they are entitled in a proper case to obtain a definitive disposition of their objections. Here a majority of the Court of Appeals for the Ninth Circuit in separate opinions strongly intimated that the District Court erred in refusing to amend the "no majority of any minority" provision of its order, but the Court nonetheless affirmed the order of the District Court denying *in toto* the motion to modify that order.

Petitioners have plainly established that they were entitled to relief from the District Court's injunction insofar as it required them to alter school attendance zones in response to shifts in demographics within the PUSD. The order of the District Court which was affirmed by the Court of Appeals equally plainly envisioned the continuation of such a requirement. We do not think petitioners must be satisfied with what may have been the implicit assumption of the Court of Appeals that the District Court would heed the "disapproval" expressed by each member of the panel of that court in his opinion. Instead, we think petitioners were entitled on this phase of the case to a judgment of the Court of Appeals reversing the District Court with respect to its treatment of that portion of the order.

## III

Because the case is to be returned to the Court of Appeals, that court will have an opportunity to reconsider its decision in light of our observations regarding the appropriate scope of equitable relief in this case. We thus think it unnecessary for us to consider petitioners' other contentions: that the District Court's 1970 in-

junction should in all respects be dissolved; that the District Court's jurisdiction over the PUSD should be terminated; or that petitioners' suggested modifications of the Pasadena Plan should be accepted as an alternative to the present plan. The record in this case reflects the situation in Pasadena as it was in 1974. At oral argument the Solicitor General discussed the Government's belief that if, as petitioners have represented, they have complied with the District Court's order during the intervening two years, they will probably be entitled to a lifting of the District Court's order in its entirety. Tr. of Oral Arg. 28–31. And while any determination of compliance or noncompliance must, of course, comport with our holding today, it must also depend on factual determinations which the Court of Appeals and the District Court are in a far better position than we are to make in the first instance. Accordingly the judgment of the Court of Appeals is vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*So ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

I cannot agree with the Court that the District Court's refusal to modify the "no majority of any minority" provision of its order was erroneous. Because at the time of the refusal "racial discrimination through official action," *Swann* v. *Board of Education,* 402 U. S. 1, 32 (1971), had apparently not yet been eliminated from the Pasadena school system, it is my view that the District Court did not abuse its discretion in refusing to dissolve a major part of its order.

In denying petitioners' motion for modification of the 1970 desegregation order, the District Court described a 3-year pattern of opposition by a number of the members of the Board of Education to both the spirit and letter of the Pasadena Plan. It found that "the Pasadena Plan has not had the cooperation from the Board that permits a realistic measurement of its educational success or failure." 375 F. Supp. 1304, 1308 (CD Cal. 1974) (footnote omitted). Moreover, the 1974 Board of Education submitted to the District Court an alternative to the Pasadena Plan, which, at least in the mind of one member of the Court of Appeals, "would very likely result in rapid resegregation." 519 F. 2d 430, 435 (CA9 1975). I agree with Judge Ely that there is "abundant evidence upon which the district judge, in the reasonable exercise of his discretion, could rightly determine that the 'dangers' which induced the original determination of constitutional infringements in Pasadena have not diminished sufficiently to require modification or dissolution of the original Order." *Id.*, at 434.

The Court's conclusion that modification of the District Court's order is mandated is apparently largely founded on the fact that during the Pasadena Plan's first year, its implementation did result in no school's having a majority of minority students. According to the Court, it follows from our decision in *Swann, supra,* that as soon as the school attendance zone scheme had been successful, even for a very short period, in fulfilling its objectives, the District Court should have relaxed its supervision over that aspect of the desegregation plan. It is irrelevant to the Court that the system may not have achieved " 'unitary' status in all other respects such as the hiring and promoting of teachers and administrators." *Ante,* at 438 n. 5.

In my view, the Court, in so ruling, has unwarrantedly extended our statement in *Swann* that "[n]either school

authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies *once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system."* 402 U. S., at 31–32 (emphasis added). That statement recognizes on the one hand that a fully desegregated school system may not be compelled to adjust its attendance zones to conform to changing demographic patterns. But on the other hand, it also appears to recognize that *until* such a unitary system is established, a district court may act with broad discretion—discretion which includes the adjustment of attendance zones—so that the goal of a wholly unitary system might be sooner achieved.

In insisting that the District Court largely abandon its scrutiny of attendance patterns, the Court might well be insuring that a unitary school system in which segregation has been eliminated "root and branch," *Green* v. *County School Board,* 391 U. S. 430, 438 (1968), will never be achieved in Pasadena. For at the point that the Pasadena system is in compliance with the aspects of the plan specifying procedures for hiring and promoting teachers and administrators, it may be that the attendance patterns within the system will be such as to once again manifest substantial aspects of a segregated system. It seems to me singularly unwise for the Court to risk such a result.

We have held that "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann* v. *Board of Education, supra,* at 15. As the Court recognizes, *ante,* at 432, there is no issue before us as to the validity of the District Court's original judgment that unconstitutional segregation existed in the Pasadena

school system. Thus, there is no question as to there
being both a "right and a violation." Moreover, at
least as of the time that the District Court acted on
the request for modification, the violation had not yet
been entirely remedied. Particularly, given the breadth
of discretion normally accorded a district court in fash-
ioning equitable remedies, I see no reason to require
the District Court in a case such as this to modify
its order prior to the time that it is clear that the
entire violation has been remedied and a unitary sys-
tem has been achieved.[1]   We should not compel the
District Court to modify its order unless conditions have
changed so much that "dangers, once substantial, have
become attenuated to a shadow." *United States* v. *Swift
& Co.*, 286 U. S. 106, 119 (1932). I, for one, cannot say
that the District Court was in error in determining that
such attenuation had not yet taken place and that modi-
fication of the order would "surely be to sign the death
warrant of the Pasadena Plan and its objectives." 375
F. Supp., at 1309. Accordingly, I dissent.[2]

---

[1] In the course of final argument, the District Judge did make
the spontaneous statement that the 1970 order "meant to me that
at least during my lifetime there would be no majority of any minor-
ity in any school in Pasadena." As did the Court of Appeals, I
disapprove the statement to the extent that it suggests that con-
tinuous redistricting can be required "even *after* the court has
determined that its plan has been effectively implemented and
*racial discrimination [has been] eliminated from the system.*" 519
F. 2d, at 438 (emphasis added).

[2] While I dissent from the Court's opinion, I do acknowledge the
narrowness of its holding. *Ante*, at 435. For instance, the Court
intimates that it would view this case differently if the demographic
changes were themselves a product of a desegregation order. *Ibid.*
Moreover, as the Court observes, this case does not involve an at-
tendance-zone requirement calling "for defendants to submit 'step
at a time' plans by definition incomplete at inception." *Ibid.*