# UNITED STATES of America

### v.

## TEXAS EDUCATION AGENCY et al.,
### (Port Arthur Independent School District) *

### Civ. A. No. 6820.

United States District Court,
E. D. Texas,
Beaumont Division.

April 28, 1981.

* *Editor's Note*: The opinion of the United States District Court, D. Maryland in *RCM Supply Company, Inc. v. Hunter Douglas, Inc.*, published in the advance sheets at this citation (510 F.Supp. 994), was withdrawn from bound volume at the request of the Court.

Drew S. Days, III, Asst. Atty. Gen., Washington, D. C., John H. Hannah, Jr., U. S. Atty., Tyler, Texas, Joel L. Selig, Kaydell O. Wright, Gregg Meyers, Dept. of Justice, Washington, D. C., for plaintiff.

Banker Phares, Phares, Phares & Bass Port Arthur, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

JOE J. FISHER, District Judge.

On September 15, 1970, this Court entered an Order desegregating the Port Arthur Independent School District (PAISD). The plan adopted by the Court was designed "to develop and maintain a unitary school system, which will provide equal educational opportunities to all students in the Port Arthur Independent School District without regard to race." *United States v. Texas Education Agency*, Civil Action No. 6820 (E.D.Tex., Sept. 15, 1970) (1970 Order). The plan employs non-discriminatory neighborhood attendance zones, with a majority-to-minority transfer option.[1] The Court at the same time ordered that the ratio of black to white teachers and other staff in each school substantially reflect the district-wide ratio. The Court retained jurisdiction of the cause in order to ensure that the plan was promptly and properly implemented. No party appealed.

Nearly ten years later, on January 28, 1980, the United States moved the Court for what it termed "supplemental relief," which would require the PAISD to implement a new student assignment plan and to assign faculty and staff to its schools in accordance with the "*Singleton* ratio,"[2] with no more than a five percent (5%) variance. A hearing was held on October 8–10, 1980. As will appear more clearly below, the Court finds that the 1970 Order created a unitary school system for the PAISD and that, therefore, it is without jurisdiction to consider the motion of the United States insofar as it relates to student assignment.

---

1. Under this option, any student assigned to a school in which his race is in the majority may transfer to a school where his race is in a minority. This program has been operated without restrictions based on available space. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 26–27, 91 S.Ct. 1267, 1281 (1971).

2. *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1969), cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970).

The Court further finds that the PAISD has in good faith attempted to comply with the 1970 Order as to faculty and staff assignment and that the phrase, "substantially the same," appearing in the 1970 Order, should be construed to allow a variance of ten percent (10%) for grades K through 5 and fifteen percent (15%) for grades 6 through 12.

I

The United States filed this suit on August 7, 1970. Both parties were directed to submit proposed plans designed to dismantle the dual school system that had existed in Port Arthur prior to *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown* I). After the parties complied, an oral hearing was held,[3] at the close of which the Court announced from the bench that an order would be entered that would provide a unitary school system for the PAISD, as that term was understood. The judgment was entered September 15, 1970, after the Court and all parties conferred and agreed that the plan that was finally implemented would unitize the PAISD.

■ "Unitary" is a term of art in school desegregation cases. A unitary school system is one which employs "a system of determining admission to the public schools on a nonracial basis," *Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (*Brown* II), where "racial discrimination [has been] eliminated root and branch," *Green v. County School Board of New Kent County*, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). It describes a system "without a 'white' school and a 'Negro' school, but just schools." *Id.* at 442, 88 S.Ct. at 1696. Uni-

tary status is "the ultimate goal," *Lee v. Macon County Board of Education*, 584 F.2d 78, 81 (5th Cir. 1978), to be achieved in these cases.

When the plan outlined in the 1970 Order was implemented on September 21, 1970, that goal was achieved. The main feature of the plan was non-discriminatory neighborhood attendance zones, with a majority-to-minority transfer option as the only exception.[4] The Court was aware at the time of entry of the 1970 Order that there would remain in operation a small number of predominantly one-race schools after the plan's implementation. The Court, and the parties, were satisfied, however, that their continued existence was not attributable to any vestige of the dual school system but was due solely to housing patterns in the community.

The plan has been successful. For example, Jefferson High School, formerly an all-white school, had a thirty-one percent (31%) black enrollment in the 1979–80 school year. Edison Junior High School, also a formerly all-white school, had a thirty-nine percent (39%) black enrollment for the same year. Lee Elementary School, formerly all-white, had a thirty-three percent (33%) black enrollment. To be sure, some of the other schools in the PAISD have not been as successfully integrated under the 1970 plan. But the lower level of integration in these schools cannot be attributed to any infirmity in the 1970 Order nor to any unconstitutionally segregative act on the part of the PAISD, but is due solely to demographic changes occurring in the community.

■ The importance of the Court's finding that the 1970 Order created a unitary school system cannot be overemphasized.

---

3. The hearing was held September 2–4, 1970.

4. In this context, it is important to note that the action of the Court in 1970 retaining jurisdiction over this cause was designed to allow the Court to satisfy itself that the plan was carried out as ordered. *See, e. g., Raney v. Board of Education*, 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727 (1968). The plan is not a "step-at-a-time" plan, *see, e. g., Carr v. Montgomery County Board of Education*, 289 F.Supp. 647, 654 (M.D.Ala.), *modified*, 400 F.2d

1 (5th Cir. 1968), *rev'd*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969) (order of district court reinstated), nor is it one that would require periodic re-examination and re-appraisal to determine when a unitary system had finally been established. The 1970 plan promised realistically to work and to work at the time of its implementation. *Green v. County School Board of New Kent County*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).

The Supreme Court has written that

> having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns.

*Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 436–37, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976). After unitary status is achieved, a District Court is without jurisdiction to entertain relief relating to post-decretal occurrences, absent a showing that such occurrences "were in any manner caused by segregative actions chargeable to the defendants," *id.* at 435, 96 S.Ct. at 2704, or that the PAISD or the State of Texas "has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554 (1971).

A hearing was held in October of 1980 for the purpose of affording the United States the opportunity to show that the PAISD violated the terms of the 1970 Order or that it has engaged in some deliberately segregative act that would entitle the government to relief, in accordance with *Swann* and *Spangler.* The evidence adduced at the hearing shows that the neighborhood attendance zones imposed by the 1970 Order have not been altered in any way. The United States did not seriously attempt to prove a violation of the 1970 Order, and the Court finds that the PAISD has been and is in full compliance with the 1970 Order insofar as it relates to student assignment.

The United States offered proof that racially identifiable schools continue to exist in the PAISD. This showing, alone, may trigger a presumption that these schools' racial identifiability is due to some intentionally segregative act on the part of the PAISD.[5] The burden then shifted to the school authorities to show that the existence of some one-race, or predominantly one-race, schools is not chargeable to any past or present segregative act on their part.

The PAISD carried its burden. The evidence shows that the overall enrollment in the PAISD declined from 16,016 in 1970 to 11,700 in 1979; that the white enrollment declined from 8,149 in 1970 to 4,298 in 1979; that 8 out of every 10 students lost from the PAISD during this period were white; that the PAISD is an impacted school district, surrounded by all-white school districts, most with increasing enrollments; that approximately 20% of the 4,316 students lost from the PAISD from 1970 to 1979 were white children who went to one of these surrounding school districts; that formerly integrated neighborhoods in the PAISD have, through no fault of the school authorities, become virtually all-black and formerly all-white neighborhoods have become integrated; and that the birth rate in

---

**5.** This presumption against one-race schools comes from *Swann,* which states that "in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part."

402 U.S. at 26, 91 S.Ct. at 1281. Although the decision in *Swann* was handed down subsequent to the entry of the 1970 Order, the Court had previously fulfilled its requirement to scrutinize one-race schools that would continue to exist after the implementation of the desegregation plan. The Court construes the language quoted above from *Swann* to be applicable only to the *initial* evaluation of a proposed plan, and not where, as here, post-decretal relief is sought. *See South Park Independent School District v. United States,* 439 U.S. 1007, 1008–12, 99 S.Ct. 622, 623–25, 58 L.Ed.2d 684 (1978) (Rehnquist, J., dissenting), *denying cert. to* 566 F.2d 1221 (5th Cir.). Nevertheless, the fifth circuit's opinion in *South Park* seems to indicate that the presumption does indeed apply in the present situation. 566 F.2d at 1225.

the City of Port Arthur has remained fairly constant during this period.

These data illustrate, among other things, a familiar phenomenon appearing in these cases known as "white flight." This phenomenon is responsible for the racial identifiability of the Lincoln, Carver, and Washington schools, which were all-black prior to 1970. The white children assigned to these schools by the attendance zones set out in the 1970 Order simply did not show up, they or their parents apparently choosing instead to move to one of the surrounding all-white school districts or to enroll in one of the private schools in the Port Arthur area.

■ Where the existence of predominantly one-race schools in an integrated, unitary school system[6] is caused by factors beyond the control of the school authorities, a District Court is without power to fashion a remedy. Our Supreme Court has written that

It does not follow that the communities served by [unitary] systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.

*Swann,* 402 U.S. at 31–32, 91 S.Ct. at 1283–1284. *See also Spangler,* 427 U.S. at 435–36, 96 S.Ct. at 2704–05. The racial identifiability of some of its schools cannot in any way be laid at the door of the PAISD. The

presumption against one-race schools arising from *Swann,* by way of *United States v. South Park Independent School District,* 566 F.2d 1221 (5th Cir.), *cert. denied,* 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978), has been overcome.

To summarize, the Court concludes that the 1970 Order created a unitary school system for the PAISD and that it is without jurisdiction to consider the motion for supplemental relief. As of the date of the hearing, the United States has shown no segregative act on the part of the defendants that would give the Court power to order the relief sought in this cause. Having determined that the PAISD is indeed unitary, and has been so for the last ten years, the Court will order that the docket on this case be closed and, absent some future action of the PAISD which would reinstitute the dual school system or would discriminate against any child on the basis of race, no further action by this Court should be necessary. *Swann,* 402 U.S. at 32, 91 S.Ct. at 1284. *Spangler,* 427 U.S. at 436–37, 96 S.Ct. at 2704–05; *Lee v. Macon County Board of Education,* 584 F.2d 78, 81 (5th Cir. 1978).

II

The United States has also moved the Court for relief based upon the alleged failure of the PAISD to comply with the provision of the 1970 Order regarding faculty and staff assignment. That portion of the Order reads as follows:

The principals, teachers, teacher aides and other staff who work directly with children at a school shall be so assigned for the school year, 1970–71, and subsequent years, that the ratio of Negro to White teachers in each school and the ratio of other staff in each are substantially the same as each such ratio is to the teachers and other staff respectively in the entire school system.

This is the "*Singleton* ratio." *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir. 1969), *cert. denied,*

---

**6.** "[T]he existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a

system that still practices segregation by law." *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281.

396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970). The evidence adduced at the hearing shows that the PAISD has not maintained strict compliance with the *Singleton* ratio. However, exactitude is not required by the terms of the 1970 Order, only that the ratio for each school be "substantially the same" as the district-wide ratio. Thus, the issue here turns on the proper construction of the language of the 1970 Order.

■■■■ The PAISD introduced evidence of its difficulty in obtaining and keeping qualified teachers to satisfy the requirements of the 1970 Order. The rapid turnover in teachers, especially white teachers, has exacerbated this problem. The PAISD has in good faith attempted to comply with the Court's Order by hiring new teachers to replace those who resign or retire, by moving surplus teachers from schools with declining enrollment to schools where they are needed, by transferring teachers between schools, and by recruiting teachers, all with the goal of compliance with the *Singleton* ratio in mind. Through no fault of its own, the exigencies of the teacher market have frustrated the attempts of the PAISD to comply. In order to foreclose future litigation on the issue of what "substantially the same" means in the context of faculty and staff assignments, the Court will interpret that phrase to permit no more than a ten percent (10%) variance from the district-wide ratio for grades K through 5, and no more than fifteen percent (15%) for grades 6 through 12.[7] Lamar school, which houses a special program, shall have no ratio whatsoever.

### III

The PAISD has advised the Court of its intention to institute a magnet school program in the Lincoln and Washington schools for the 1981–82 school year. The experience of other school districts shows that a magnet program will increase the level of integration in the schools into which such a program is placed. The PAISD also intends to close two elementary schools, Carver and Sims, and reassign the students affected to other schools. The undisputed evidence shows that such action would be economically feasible and educationally sound and would increase the overall level of integration in the PAISD. Nothing in this Memorandum Opinion and Order should be construed to prevent the PAISD from implementing any program or plan that it considers educationally and administratively sound, so long as the level of integration is not thereby decreased.

In conclusion, the Court finds that the 1970 Order created a unitary school system for the PAISD. Since there was no proof that the school district committed any act with segregative intent, the Court is without jurisdiction to entertain the motion of the United States. Substantial compliance with the provision of the 1970 Order as to faculty and staff ratios should be construed to allow a variance of ten percent for grades K–5, and fifteen percent for grades 6–12, from the district-wide ratio. The PAISD has been unitary since September 21, 1970. Therefore, this cause should be dismissed and removed from the docket of this Court.

*It is so ordered.*

---

**7.** The evidence indicates that secondary teachers (grades 6–12) are more difficult to find and to keep than primary teachers.