BEAM, Circuit Judge,
concurring and dissenting.
I concur in the court’s general explication concerning the former, and partly applicable, terms and conditions of the “broad school choice transfer option[s],” Teague v. Cooper, 720 F.3d 973, 975 (8th Cir.2013), contained in Arkansas Code Annotated § 6-18-1901 et seq., the Public School Choice Act of 2013 (the 2013 Act). I also concur in the court’s conclusion that a portion of this appeal was mooted by the Arkansas General Assembly’s repeal of former § 6 — 18—1906(b), the transfer exemption portion of the 2013 Act, upon its enactment of Arkansas Code Annotated § 6-13-113.
I likewise agree with the court’s conclusion that notwithstanding this recent legislative revocation, the appellants remain positioned, upon presentation of satisfactory proof, to recover money damages, costs and fees arising from the purposeful and unconstitutional pre-repeal misuse by the Blytheville School District (the “Blytheville District”) of the school choice transfer exemption clause, the now abolished § 6-18-1906(b). The 2013 Act remains continuingly viable and fully relevant for purposes of finding and calculating appellants’ damages. The constitutionally protected rights at issue include statutorily enforceable property interests in matters of public school choice as well as equal protection violations arising through the unlawful and unconstitutional use of the previously existing school district transfer exemption apparatus.
I disagree, however, with the court’s conclusions that the appellants have failed to prove these constitutional violations. To the contrary, the appellants successfully establish both procedural due process and equal protection claims. Accordingly, I would remand the case to the district court to determine all necessary legal and factual issues concerning liability and monetary damages.
I.
I turn first to an analysis of the specific constitutional claims advanced by the appellants. I agree with the court that the appellants fail to prove they have a protected liberty interest. But, the appellants fully succeed on their procedural due pro *975 cess claim, as the 2013 Act clearly created a protected tangible property interest in public school choice and attendance in Arkansas. The court found that appellants did not have a property interest in public school choice because the property interest defined in Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), was “the right to participate in the entire educational process and not the right to participate in each individual component of that process.” Ante at 968 (quotation omitted). In support, the court says the appellants “have not been excluded from the educational process” as they were not prevented from attending public school. Id. (quotation omitted). However, the Legislature of Arkansas statutorily created a much more specific property interest, not just an interest in public school services for the parent and child somewhere in the State of Arkansas. The 2013 Act created for the nonresident district applicant a school of the parent and student’s “choice” in another Arkansas district. See Goss, 419 U.S. at 572, 95 S.Ct. 729 (stating that protected interests in property are created by “an independent source such as state statutes or rules”). Unfortunately, the court attempts to use the statute’s exemption clause to improperly slice and dice the relevant property interests created by Goss and the 2013 Act, using inapposite district court precedent to support its incorrect conclusion.[10]
The 2013 Act created justifiable expectations that studénts could “attend a school in a nonresident district.” Ark.Code Ann. § 6-18-1903(a) (2013). Although the 2013 Act gave the nonresident school district the discretion to decide whether to accept a student seeking transfer, id. § 6-18-1903(d)(1), the terms of the 2013 Act illustrate that the legislature envisioned that the capacity of the nonresident school district would be the only and exclusive determining factor as to whether the nonresident school district accepted a student’s transfer application. See id. § 6-181903(d)(2), (3) (prohibiting a nonresident district from considering an applicant’s academic achievements, athletic or other extracurricular ability, English proficiency level, or disciplinary record in evaluating their application for transfer).[11] Additionally, the 2013 Act provided that a nonresident district had to state a reason for the rejection if the student’s transfer application was not accepted. Id. § 6-181905(b)(2). Finally, the 2013 Act provided that an applicant whose transfer application was rejected was entitled to a hearing before the state board to reconsider the transfer, as long as she submitted a request for the hearing in writing within ten days after receipt of her rejection. Id. *976 § 6 — 18—1907(b)(1), (2)(A). Thus, as later explained in more detail, the public school choice transfer right established in the 2013 Act was more than “a mere subjective expectancy of school choice,” ante at 968. Under the 2013 Act, the appellants had a “legitimate claim of entitlement,” id. at 968 (quotation omitted), to “choose from among different schools with differing assets,” Ark.Code Ann. § 6 — 18—1901(b)(1) (2013), and when the Blytheville District wrongly and unconstitutionally exempted itself from the 2013 Act, the Blytheville District unlawfully deprived appellants of their protected property interest and hearing rights. The appellants clearly establish that the Blytheville District did not afford them adequate and statutorily specified procedural rights designed to protect their constitutionally protected property interests, and thus the Blytheville District violated the appellants’ due process rights, see ante at 965-66, for which violations the appellants are entitled to monetary damages.[12]
II.
I also disagree with the court’s analysis of appellants’ demand for damages under *977 their equal protection claims. Despite the court’s finding to the contrary, see id. at 972-78, nothing in the record in this case generated “at least a rational basis for [Blytheville District’s] believing that the 2013 Act authorized it to take the exemption.” Id. at 973. Indeed, the record clearly prevented the Blytheville District from nullifying appellants’ attempted transfers to the nonresident district. No reasonable reading of Franklin v. Board of Education of the Blytheville, Arkansas, School District No. 5, No. J-71-C-35 (E.DArk.), allowed the Blytheville District to believe it was still subject to a desegregation order of any nature.
Judge Eisele on August 19, 1971, entered an order that approved Blytheville District’s desegregation plan for its high school, junior high schools, and elementary schools. In that same order, the court further approved the Blytheville District’s desegregation plan with respect to faculty and administrative staff assignments— with four minor reservations. On June 21, 1973, Judge Eisele, noted that the items reserved as mentioned above “are no longer a subject of controversy” and closed the case, reserving jurisdiction “for necessary and appropriate purposes.” Five years later, on December 6, 1978, Judge Eisele issued an order fully dismissing the Franklin case. Thus, the plain language of these orders leaves no doubt that the Franklin court closed the case and ultimately ceded jurisdiction over the case and the parties. Therefore, as earlier noted, the Blytheville District had no rational basis for believing it was still subject to a desegregation order, and consequently no means of lawfully exempting itself from thé 2013 Act.[13] The Blytheville District’s *978 violation of the 2013 Act and the subsequent disparate treatment that resulted— allowing intra-district transfers to the Kipp Delta charter school, but denying appellants’ inter-district transfers under the 2013 Act — violated appellants’ equal protection rights, for which appellants are entitled to monetary damages.
The district court strangely found — apparently responding to Blytheville District’s wholly frivolous contention that Judge Eisele’s order should have contained some “unitary school system” language — that even after the passage of at least thirty-seven years of Blytheville District’s lawful operation as a unitary (non-dual) school system, the Blytheville District was still subject to a Franklin desegregation order. This was error. The district court’s incorrect holding that Judge Eisele, in Franklin, should have made a specific finding that the Blytheville District had achieved unitary status in order to properly dismiss the August 1971 desegregation action is based on inapposite cases and faulty analysis of applicable law. Indeed, at the time the Franklin court dismissed the action in 1978, there was no case law requiring a finding of unitary status in order to properly close a desegregation order. The two cases the district court relies on for the requirement that a finding of unitary status is necessary are Jenkins by Jenkins v. State of Missouri, 122 F.3d 588 (8th Cir.1997), and Lockett v. Board of Education of Muscogee County, 92 F.3d 1092 (11th Cir.1996). Not only were these two cases decided nearly two decades after Franklin, both cases are factually distinguishable from Franklin. In Lockett, the court ordered the school district to present and implement a desegregation plan in 1971 and continued to maintain jurisdiction over the case into the 1990s, even though the district court “ignored the school district’s actions after 1980.” Id. at 1097-98. Similarly in Jenkins, the district court still had jurisdiction over the desegregation action, and action in the case was ongoing, into the 1990s. Jenkins by Jenkins, 122 F.3d at 590-91. Conversely, in Franklin, the case was dismissed for all purposes and without appeal in 1978, long before the case law established, if any binding litigation ever has, any precedent that required district courts to make an express finding of unitary status. In sum, the unitary status contention frivolously asserted by the Blytheville District and wrongly accepted by the district court was simply an unsupportable excuse for improperly urging a non-existent transfer exemption — not a basis for the district court’s interference with the transfers.
Contrary to the district court’s findings, the Franklin court had done all that was required to close the case. When the Franklin case was dismissed in' 1978, if a school district had achieved the objectives of a desegregation order, the district court’s remedial authority over those objectives was ended and the injunction was dissolved. See Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 436-37, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). Judge Eisele’s actions in the Franklin case make clear that he believed the Blytheville District had achieved the objectives of all desegregation orders. Thus there is no credible evidence that the Blytheville District has been subject to a desegregation order related to the Franklin case since December 6,1978.
Penultimately, with regard to the Blytheville District’s transfer exemption claim, I note that the Board of Directors of the Blytheville District do not and cannot deny that they, and their predecessor Boards, have actually operated a desegregated unitary public school system since at least 1978. There also appears to be no evidence in this case, or even any claims, that a dual, segregated public school system or any vestiges of the same has in any *979 way operated since Judge Eisele’s final order in 1978. Accordingly, the Blythe-ville District’s exemption claims were, in substance, wholly specious.
Finally, in the alternative, the district court erred in granting summary judgment in favor of the Blytheville District. Summary judgment is only proper if there are no genuine issues of material fact. Fed.R.Civ.P. 56. A district court’s finding of unitary status is a finding of fact, reviewed for clear error. Fisher v. Tucson Unified School Dist., 652 F.3d 1131, 1136 (9th Cir.2011). In the instant case then, if there is a genuine dispute as to whether' there is or is not unitary status, as seemingly advanced by the Blytheville District, the granting of summary judgment to the Blytheville District was erroneous.
For the aforementioned reasons, I respectfully dissent on the issue of the appellants’ damages arising from their procedural due process and equal protection claims and would remand the issues back to the district court to determine monetary damages, costs, and fees.

. The 2013 Act's broad school choice transfer option as recognized by Teague authorizes the transfer of the "entire educational process," as it is defined by Goss. Ante at 968 (quotation omitted). And, the district court opinion cited by the court, Mazevski v. Horseheads Central School District, 950 F.Supp. 69 (W.D.N.Y.1997), does not support a contrary holding. Mazevski deals not with a nonresident, interschool district transfer of the entire educational experience as is contemplated by the 2013 Act and appellants. Rather, the limitation imposed in Mazevski involved a single student being precluded from performing with his school’s marching band — from which he was dismissed for individual misconduct. The 2013 Act’s exemption clause was in no way designed to create “individual componentes]" of the Arkansas educational experience — it was a broad administrative procedure improperly employed in this case to wholly abort the appellants’ children’s entire educational process in a nonresident district of their parents’ choice.

. And, in fact, aside from the applicant’s personal information — name, age, grade level, home address, etc. — the only other information the application for transfer under the 2013 Act requested was the name and address of the applicant’s resident school district and the name and address of the nonresident school district the applicant wished to attend.

. In a further attempt to void this statutorily established and constitutionally protected school transfer prerogative, the district court and this court seek to disembowel and thus, overrule the thrust of the Supreme Court's holding in Goss. To do so, the district court and this court assert that the 2013 Act created only a "mere subjective expectancy of school choice." Ante at 968. In this effort, this court cites a series of inapplicable rules, irrelevant dictionary definitions and inapposite case law. The court accurately states, and then disregards, the fact that the only limiting acceptance choice the 2013 Act provides a receiving school district concerning a transferring student's property right is the student "capacity” of such receiving school. But, in this dispute, the unlawful Blytheville District exemption claim sought to and did miscarry any attempt by the appellants to test this "capacity” question in the putative receiving districts. How this de minimis and untested capacity limitation can be allowed to derail the appellants’ constitutionally protected property interests, without a statutorily required hearing of any nature, is not explained or even addressed by this court.
The court's sole cited precedent for this unsupportable “subjective expectancy” contention is an unpublished Fifth Circuit case, Horton v. City of Smithville, 117 Fed.Appx. 345, 347-48 (5th Cir.2004) (unpublished). Strangely, this case deals not with a constitutionally protected property interest, but with whether the appellant, Horton, had a property interest in the City of Smithville's lack of enforcement of the city's zoning ordinance prohibiting the staging of a live music event on a neighbor’s property. The answer by the court was that he did not. Id. at 348. However, what light the Horton decision sheds upon whether the appellants in this case have an actionable constitutionally based property interest granted by the Arkansas statute is wholly shaded. And importantly, the Horton case is of dubious force as citable precedent since the Fifth Circuit attaches no precedential value to an unpublished opinion, Fifth Circuit Appellate Rule 47.5.4, and neither does this circuit. Eighth Circuit Appellate Rule 32.1A.
It is also worth mentioning that the Arkansas statute explicitly states that a "school district receiving transfers under this [school choice] act shall not discriminate on the basis of gender, national origin, race, ethnicity, religion, or disability.” Ark.Code Ann. § 6 — 18— 1903(d)(3). Thus, it is patently inconsistent with the general racial policies established in the 2013 Act that the Board of Directors of the Blytheville District should now attempt to oppose appellants' school transfer efforts with its letter of April 22, 2015, to the Arkansas Department of Education (ADE), which letter raises issues of "desegregation obligations ... (i.e., the creation, maintaining, or increasing of racially identifiable schools).” Ante at 964. Such issues were put to rest by Judge Eisele’s interdicting dismissal order of December 6, 1978. This is an especially questionable argument by the Blytheville District given the blind eye presented by its Board of Directors to the 250 student exodus in 2009 mostly from the Blytheville District to the Kipp Delta Academy School "the majority of whom [were] African Americans or other minorities.” Ante at 971.

. As the court notes, the Blytheville District also claims that a May 31, 1973, letter sent from the United States Department of Health, Education, and Welfare (HEW) is a "mandate by a federal agency that it cannot return to the dual school system." Ante at 973. The record is clear that this claimed continuing mandate is unfounded. The HEW letter stated that the Blytheville District "must modify its [desegregation] plan as may be ordered by the court to remain in compliance.” (Emphasis added.). Less than a month later, Judge Eisele issued his June 21, 1973, order finding that the matters mentioned in the HEW letter were “no longer a subject of controversy” and he then closed the case. The timing of Judge Eisele’s June 21, 1973, order in relation to the May 31, 1973, HEW letter obviously establishes that he felt no further modification of the desegregation plan was necessary for the school district to "remain in compliance.” Further, once Judge Eisele ceded jurisdiction in the case over the parties through his December 6, 1978, order, the court no longer retained any authority to order the school district to modify its desegregation plan. Thus, HEW’s May 31, 1973, letter, on its own, cannot credibly be read as a "mandate of a federal ... agency remedying the effects of past racial segregation,” because the letter instructs the school district to follow any order "by the court,” which later closed the case and ceded jurisdiction over the parties. As a result, since at least 1978 there has no longer been an active desegregation plan which the government or a private party could “seek modification of,” and there is also no way for the Blytheville District to fall out of compliance with a long since-closed desegregation order.
The district court and this court found credible the Blytheville District’s argument that the February 11, 1971, HEW letter to the school district and the May 31, 1973, HEW letter to the ADE continue to stand as “active mandates” prohibiting changes that in any manner increase "racially identifiable schools.” In this case, the Blytheville District’s argument obviously means not permitting any “Caucasian” exodus from the district. This active mandate stands, according to the Blytheville District, and now this court, notwithstanding Judge Eisele’s interdiction order of December 6, 1978, and according to the record in this case, the passage of at least thirty-seven years of the Blytheville District’s operation of a desegregated "unitary non-racial” school system and accompanied by no evidence of any activities causing substantial racial imbalance changes in the district except, pérhaps, the Blytheville District’s authorized movement of the 250 students to Kipp Delta Academy in 2009. Ante at 971.