**LITTLE ROCK SCHOOL DISTRICT, Plaintiff,**

**v.**

**PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; North Little Rock School District; Arkansas State Board of Education; Wayne Hartsfield; Wal-** ter Turnbow; Harry A. Haines; Jim Dupree; Dr. Harry P. McDonald; Robert L. Newton; Alice L. Preston; Jeff Starling; Earle Love; Bob Lyon; John Ward; Judy Wear; Leon Barnes; Marianna Gosser; Steve Morley; Mac Faulkner; Bob Moore; Don Hindman; Shirley Lowery; Sheryl Dunn; David Sain; Bob Stender; Grainger Williams; Richard A. Giddings; George A. McCrary; Buddy Raines; and Dale Ward, **Defendants,**

Katherine Knight, Individually and as President of The Little Rock Classroom Teachers Association (LRCTA); LRCA; Ed Bullington, Individually and as President of The Pulaski Association of Classroom Teachers (PACT); PACT; John Harrison, Individually and as President of The North Little Rock Classroom Teachers Association (NLRCTA); NLRCTA; and Milton Jackson, Individually and as a Non-Certified Educational Support Employee of the Little Rock School District, Lorene Joshua, as next friend of minors Leslie Joshua, Stacy Joshua and Wayne Joshua; Rev. Robert Willingham; Sara Matthews as next friend of Khayyam Davis, Alexa Armstrong and Karlos Armstrong; Mrs. Alvin Hudson as next friend of Tatia Hudson; Mrs. Hilton Taylor as next friend of Parsha Taylor, Hilton Taylor, Jr. and Brian Taylor; Rev. John M. Miles as next friend of Janice Miles and Dereck Miles; Rev. Robert Willingham on behalf of and as President of the Little Rock Branch of the NAACP; Lorene Joshua on Behalf of and as President of the North Little Rock Branch of NAACP, Becky McKinney, Mary J. Gage, Janice Dent and Joyce Person, **Intervenors.**

No. LR–C–82–866.

United States District Court,
E.D. Arkansas, W.D.

April 30, 1987.

Supplemental Order May 8, 1987.

See also, 659 F.Supp. 363.

P.A. Hollingsworth, Philip E. Kaplan, Janet L. Pulliam, John M. Bilheimer, Little Rock, Ark., for plaintiff.

Wright, Lindsey & Jennings, Little Rock, Ark., Neal, Gerber & Eisenberg, Chicago, Ill., C.R. McNair, III, Asst. Atty. Gen., Sharon Streett, Dept. of Educ., Jack, Lyon & Jones, Stephen L. Curry, Little Rock, Ark., for defendants.

Theodore Shaw, New York City, John W. Walker, Little Rock, Ark., for intervenors Joshua, et al.

Richard Roachell, Cearley, Mitchell & Roachell, Little Rock, Ark., for intervenors Knight, et al.

Robert D. Cabe, Cabe & Lester, Little Rock, Ark., for intervenors McKinney, et al.

## ORDER

HENRY WOODS, District Judge.

### I.

Plaintiff, Little Rock School District (LRSD) has moved the Court to recuse pursuant to 28 U.S.C. § 455(a), which provides:

Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

■ The test with respect to disqualification under this section is an objective one. The charge of impartiality must be grounded on facts that would create a reasonable doubt as to the judge's impartiality, not in the mind of the judge or in the mind of the litigant moving for recusal, but rather in the mind of a reasonable, uninvolved observer. *Gilbert v. City of Little Rock*, 722 F.2d 1390 (8th Cir.1983).

The Eighth Circuit has explained that "a claim of bias must be evaluated in light of the *full* record, not simply in light of an isolated incident," *In re Federal Skywalk Cases*, 680 F.2d 1175, 1184 (8th Cir.1982), *cert. denied, Rau v. Stover*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982) (emphasis added). Moreover, "a judge is presumed to be impartial, and the party seeking disqualification bears the *substantial* burden of proving otherwise." *Ouachita Nat. Bank v. Tosco Corp.*, 686 F.2d 1291, 1300 (8th Cir.1982) (emphasis added). The legislative history to § 455 makes clear that a judge is not to recuse quickly:

■n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are, in fact, seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice. S.Rep. No. 93–419, 93d Cong., 1st Sess. 1973, p. 5 (emphasis in original).

*Ouachita Nat. Bank v. Tosco Corp. supra*, at 1300 (*quoting* H.R.Rep. No. 1453, *reprinted in* 1974 U.S. Code Cong. & Ad. News 6351, 6355).

■ The Court has an affirmative duty to deny a motion to recuse if recusal is unnecessary, *Davis v. C.I.R.*, 734 F.2d 1302 (8th Cir.1984). This is particularly true in school desegregation cases, where as here, "a single judge has acquired, by experience, familiarity with a protracted, complex case, which could not easily be passed on to a second judge." *Bradley v. School Board*, 324 F.Supp. 439, 449 (E.D. Va. 1971).

In desegregation cases, judicial awareness of local conditions is not only permitted, but expected. It is precisely because of a trial court's knowledge of local conditions that trial judges in desegregation cases are given great deference. As Judge

Heaney, writing for the majority, noted in an earlier appeal of this case:

> Undiminished deference [is to be given] to the factual adjudications of federal trial judges in cases such as these, uniquely situated as those judges are *to appraise the societal forces at work* in the communities where they sit.

*Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist.*, 778 F.2d 404, 411 (8th Cir. 1985), *Cert. denied,* —— U.S. ——, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986), *quoting, Columbus Board of Education v. Penick,* 443 U.S. 449, 470, 99 S.Ct. 2941, 2983, 61 L.Ed.2d 666 (1979) (emphasis supplied).

With these principles in mind, I have given careful and deliberate consideration to LRSD's Motion to Recuse.

## II.

During this long, emotional and highly charged litigation, which was assigned to me in 1982, I have been asked to recuse on four different occasions, by four different parties—Pulaski County Special School District (PCSSD), Joshua Intervenors, North Little Rock School District (NLRSD) and now LRSD. Coincidentally, these motions to recuse came in the wake of rulings which the movants perceived to be unfavorable to their cause. For example, in 1984, PCSSD moved the Court to recuse after the Court rejected its desegregation plan. The same attorney who has filed the pending Motion to Recuse filed a response to PCSSD's Motion to Recuse, and said:

> 4. If PCSSD has any relief available, it is through appeal and not disqualification of the presiding judge. PCSSD fails to present any proposition which establishes that a magistrate may be disqualified when a party disagrees with a portion of a decision.
>
> 5. With regard to the television interview, PCSSD has failed to set forth a single word, phrase, sentence, or idea which in any way has caused the appearance of partiality.
>
> 6. PCSSD refers to no statute or case law which prohibits a member of the federal judiciary from granting interviews or making statements.

Now, two years later, LRSD's attorneys argue, for essentially the same reasons offered by PCSSD in 1984, that I should disqualify myself from presiding in this case.

Ironically, LRSD has generally been the beneficiary of the multitude of rulings which I have issued in this case. In fact, the main thrust of this suit, filed by LRSD, was that there should be county-wide consolidation of the three districts. I adopted this approach in fashioning a remedy. However, the Court of Appeals reversed in part and mandated a different remedy, which I have been in the process of enforcing during the past year.

The Court of Appeals did not set aside or find erroneous a single one of the 105 factual findings which I made in this case. Instead, the Court of Appeals concluded that the consolidation remedy was "too drastic." Instead of consolidating the three districts, the Court of Appeals simply extended the boundary of LRSD to the Little Rock City limits. The other remedies which I fashioned were upheld, and the Court of Appeals added some of its own— one of the principal remedies being a system of magnet schools. During the past year, I have held a series of hearings with regard to the final plan of the three districts submitted in response to the mandate of the Court of Appeals.

## III.

In support of its Motion to Recuse, LRSD alleges that I have violated Canon 3 A(4) of the Code of Judicial Conduct which provides:

> A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.

A similar charge was made against Judge DeMascio in the Detroit desegregation case. *Bradley v. Milliken,* 426 F.Supp. 929 (E.D.Mich.1977). As Judge DeMascio observed, Canon 3 A is primarily concerned with protecting the adversarial nature of

judicial proceedings, particularly where communications involve pending contested issues.

> Although there does not appear to be a consensus regarding the precise boundary between the proper and the improper, it is clear that the trial judge is not required to be inert; nor is he compelled to act as if he were merely presiding at a sporting match. *United States v. Green,* 544 F.2d 138, 147 (3d Cir.1976). This is particularly so in the case at bar, where we were peripherally involved in matters which could not affect the outcome of contested issues but which had a great effect on this court's ability to enforce its orders.

*Id.* at 935 n. 5. In that case the moving parties complained that, prior to filing his opinion, the judge had met *ex parte* with representatives of the school board and its counsel. They further alleged that Judge DeMascio had secretly informed various individuals and groups what his opinion would be in order to garner public support for his Order. The Court of Appeals, in affirming Judge DeMascio's denial of the recusal motion, characterized the judge's actions as "perhaps a bit unorthodox," but nonetheless "judicial activities." *Bradley v. Milliken,* 620 F.2d 1143 (6th Cir.1980).

By contrast, the merits of this case were decided long ago. The gist of LRSD's Motion is that the Court on its own motion noticed apparent violations of its Orders. Apparently, LRSD believes that I should have waited for a litigant to bring to my attention violations of the Court's Orders. (It is instructional to read the account of the 1957 Little Rock desegregation case in *Faubus v. United States,* 254 F.2d 797 (8th Cir.1958) wherein Judge Davies ordered the LRSD Board and its superintendent to show cause why they should not proceed with their court-approved desegregation plan). The history of this litigation provides a vivid illustration of the ramifications of LRSD's position. In 1973, the Pulaski County Special School District (PCSSD) entered into a consent decree in *Zinnamon v. Board of Education of Pulaski County Special School District,* No. LR–68–C–154 (W.D. Ark.1973). Under that decree, the PCSSD agreed to take a number of remedial steps to cure the effects of admitted segregative acts. Judge Henley, the presiding district judge, was shortly thereafter appointed to serve on the Eighth Circuit Court of Appeals. For *nine years* the consent decree was ignored by all parties in substantially every detail. During that time, many of the problems effecting the current litigation arose, largely due to the oblivious attitude toward Judge Henley's order.

When the Court has reason to believe its orders are being ignored, surely it need not sit idly by waiting until a party invites the court to require compliance. It is not the school board members or the school superintendents who suffer when desegregation plans are ignored, but the school children, black and white. Petitioner complains that I received a delegation of students bearing petitions with hundreds of names, complaining that my orders were being disregarded by massive teacher reassignments. I had every right to listen to these students. They are the real parties in interest.

In *Reed v. Rhodes,* 472 F.Supp. 618 (N.D. Ohio 1979), the district court issued an order making clear that it would not tolerate further disregard of the court's desegregation orders. The court explained that the parties have a duty to keep the court informed, and the court has a corresponding duty to insure that its orders are complied with:

> The defendants have the duty to follow the letter and spirit of this Court's decrees. If they knowingly attempt to avoid a judicially defined duty, they may be subject to sanction.

> The defendants have the further burden to provide information and assistance to this Court. The Court has the duty to review the plans and activities of the defendants to judge whether they pass constitutional muster. The standard of review is one of fundamental fairness, *Swann v. Board of Education, supra,* [402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)], *Davis v. School Commissioners of Mobile County,* 402 U.S. 33 [91 S.Ct.

1289, 28 L.Ed.2d 577] (1970). The Court, however, requires input from the school system. Without such aid, the Court must make a judgment which, for the lack of information and assistance, may not be the best solution given all of the extant, yet unidentified circumstances.

472 F.Supp. at 621.

## IV.

Without a single shred of supporting evidence, LRSD asserts in its Motion to Recuse that "[t]he Court has since January, 1987, discussed matters regarding this case with any person who will call the Court's offices and has taken actions in this case based upon those conversations, and upon matters wholly outside of the records." This statement is an unmitigated falsehood. Telephone calls to my office are routinely screened by my staff. It is only on those rare occasions when my secretary, both of my law clerks, and my court reporter are out of the office that I directly receive a telephone call. Even then, however, I do not discuss or express an opinion on the merits of any pending issues in a case. LRSD has not cited a single example of a telephone call which supposedly influenced any decision which I have made in this case.

## V.

■ LRSD next contends that I rejected PCSSD's Plan in response to public clamor and *ex parte* communications, rather than on the merits of the Plan. When PCSSD's Plan was rejected, I made the following statement in open court:

In fairness to the Pulaski County Board and officials of that District, I must advise you that I will not approve the student assignment plan submitted by the Pulaski County District.

This plan contemplates an inordinate amount of busing of both black and white children. It has the violent opposition of a large segment of the patrons in the District, both black and white.

My office has been flooded with mail and telephone calls in opposition to the proposed plan. While I do not decide cases in response to public clamor, it is obvious there must be some public support of a student assignment plan. Otherwise, white flight to private schools and to schools in other counties will destroy the racial balance we seek to achieve and seriously harm the well-being of the County School system.

Contrary to impressions cultivated by some of your District officials and others with their own axes to grind, the Federal Courts have had no input whatsoever into the plan advanced by the Pulaski County District. This is not my plan or the plan of the Court of Appeals. In my opinion, it's a poor plan. I have repeatedly stated in open court that a minimum of busing should be employed as long as constitutional requirements are met.

In my original remedial opinion in this case, I wrote as follows: "Transportation within the District must be accomplished with a view toward minimizing the number of students that must be bused," *Little Rock School District against Pulaski County Special School District*, 597 F.Supp. 1220, 1225.

The Court of Appeals in its Opinion established a considerable amount of flexibility for students assignments with the obvious purpose of diminishing long bus rides. Some of the bus rides required in the Pulaski County plan would keep children on buses for two hours a day and require them to traverse the heart of Little Rock during the height of the rush hours.

With a District as large as the Pulaski County District, 700 square miles in size, circling like a doughnut around the far reaches of the county, busing will be necessary. This is one reason I favored consolidation. I still feel that through consolidation, busing could have been materially diminished. But a more reasonable and equitable plan can be formulated than the one submitted to me.

Adoption of one feature of the Little Rock Plan would, in my opinion, markedly increase the acceptability of a Pulaski County Plan. The Little Rock Plan permits parents dissatisfied with the as-

signments to submit three alternate choices, which the Little Rock School officials will try to accommodate. I believe that such a plan would be desirable in the county.

The basis for my holding was my extensive knowledge of the geography of PCSSD, the roads in PCSSD, the location of PCSSD schools, and the busing requirements of PCSSD's Plan. All of these were before the court at the time PCSSD's Plan was rejected.

On February 18, 1987, Mr. Samuel Jones, counsel for PCSSD, formally responded to my rejection of PCSSD's Plan by withdrawing the proposed Plan. The statement he made at the time is attached hereto as Exhibit A. LRSD said nothing at the time to indicate that it disagreed with my ruling or took exception to it in any way. On the final day of the hearing, I made the following statement in open court:

> You know, I've lived in this county for 35 years. I know the geography, and I know what the Court said in its Opinion, and I'm supposed to carry it out, and I have studied these plans and I understand the geography, and I think I know where most of the schools are located, and I think I know where most of the roads are located, and I've been around here for awhile and been connected with schools and school controversies for a long, long time, and I'm glad to have this expert testimony, but at this point in the case I'm simply carrying out the mandate of the Court of Appeals, and I think it's pretty clear.

It is ludicrous for LRSD to suggest now that my rejection of the PCSSD Plan was the result of telephone calls I received protesting the Plan. Though my office was indeed flooded with phone calls (which had the highly disruptive effect of tying up the time of my secretary and my law clerks), the suggestion that this public clamor influenced my decision to reject PCSSD's Plan is totally unsupported by the record and the history of this litigation.

The number of protesting phone calls which I received regarding the PCSSD Plan pales in comparison to the number of phone calls I received after my original ruling, consolidating the three districts. During the time-period following my original ruling, not only was my office inundated with telephone calls, but some of them were so threatening that the FBI requested permission to install a monitoring device. During this same time-period, I was threatened with impeachment and the editor of one of the local newspapers wrote that the Court was "not worth the shot and shell to blow [me] away." If I were prone to bow to public clamor, I would have promptly vacated my Order consolidating the districts.

## VI.

■ LRSD next contends that I have prejudged the outcome of the April 29, 1987 hearing. The purpose of the hearing, as set forth in my Order of April 15, 1987, and in my letter Order of March 20, 1987, is to afford LRSD an opportunity to explain why the Plan which I approved cannot be implemented according to its terms.

Though none of my Orders mentioned "contempt," LRSD's attorneys, in an apparent attempt to sensationalize this case and distort the meaning of my Orders, publicly announced that the April 29 hearing was a contempt proceeding which might result in the LRSD Board going to jail. This notion became so widespread that I found it necessary on April 21, 1987 to write LRSD's attorneys, quoting excerpts from the Court's previous Orders, for the purpose of making clear that the April 29 hearing was not, and was never intended to be, a contempt proceeding.

In response to my letter Order of March 20, 1987, LRSD's attorneys requested a conference, which was held on March 27, 1987. On March 25, 1987, two days before the conference, Mr. P.A. Hollingsworth, one of the attorneys representing LRSD, wrote a letter to the Court addressing the concerns I had expressed in my letter Order. After addressing my concerns generally, Mr. Hollingsworth admitted that LRSD had deviated from the Plan's operating procedures for student assignments by changing the time for making choices from 30 days to 18 days:

We apologize for changing the time for making choices from 30 days to 18 days. Although there is an explanation for the change, in retrospect, it would have been appropriate to have contacted the Court with the explanation prior to making the change.

At the conference on March 27, 1987, Mr. Philip Kaplan, another attorney representing LRSD, spoke on behalf of LRSD. At the very outset of the conference, Mr. Kaplan admitted in open court that, by compressing the time-frame for making student assignments, LRSD had not complied with the Plan's requirements regarding student assignment. On behalf of LRSD, Mr. Kaplan apologized to the Court for having deviated from the Plan without first seeking the Court's approval.

In light of the fact that its own attorneys have admitted on the record that LRSD unilaterally departed from the Plan's specific operating procedures, and did so without the Court's knowledge or approval, I am at a loss to understand LRSD's contention that I have predetermined the outcome of the April 29 hearing. By its own admissions, LRSD has consciously disregarded the specific terms of the Plan's provisions regarding student assignment. There is nothing left to judge. The purpose of the April 29 hearing is merely to afford LRSD an opportunity to explain its actions.

LRSD contends that it had legitimate reasons for departing from the Plan's specific requirements. It has long been recognized, however, that Courts have a "well-established insistence that those who are subject to the commands of an injunctive order must obey those commands, notwithstanding eminently reasonable and proper objections to the order, until it is modified or reversed." *Pasadena City Bd. of Ed. v. Spangler*, 427 U.S. 424, 439–40, 96 S.Ct. 2697, 2706, 49 L.Ed.2d 599 (1976). Even if it is established at the April 29 hearing that LRSD had an "eminently reasonable" basis for departing from the Plan's specific requirements, it should have moved the Court to modify the Plan before doing so on its own initiative, as LRSD's attorneys admitted at the March 27 hearing. The failure to seek the Court's prior approval of the modification, if not contemptuous, was inexcusable.

### VII.

■ LRSD's Motion to Recuse alleges in paragraph 4 as follows:

On March 20th the Court sent a letter to counsel for LRSD concerning its student assignment plan, and directing that LRSD make "as little change as possible in the present staffing." Contemporaneous newspaper accounts indicate that there were numerous ex parte contacts with the Court. There was also widespread public comment concerning the Plan, but no actual evidence taken.

In support of this statement, LRSD has attached to its Motion five newspaper clippings. LRSD has not submitted a single affidavit or any other credible evidence to support this assertion. I will avoid the temptation to comment on the evidentiary value of unsupported newspaper clippings. Instead, I will describe the text of the clippings, which demonstrates the tenuous nature of the "evidence" supporting LRSD's Motion. I have read each of them carefully. Not one of them supports in the slightest extent the assertion about *ex parte* contacts with regard to my order of March 20.

The first clipping is devoted entirely to a reporter's interview of parents who expressed disapproval of the student assignment plan. The second clipping is a story about a proposed appeal of the PCSSD plan by the LRSD. It quotes one of the attorneys for the LRSD and the chairman of the Board of LRSD. The third clipping deals entirely with the Court's letter Order of March 20 and the reaction thereto. The fourth clipping concerns a meeting of the LRSD Board. The last clipping is a story about the flood of protests received at the LRSD office regarding student assignments. The last sentence in the article reads: "However, a spokesman for the Judge, who has approved the District's student assignment Plan, would not comment." A close examination of these articles fails to disclose any support for the

blatant misstatements contained in paragraph 4 of LRSD's Motion to Recuse. The above-quoted sentence is the only reference to any contacts with my office. Who is this phantom spokesman? To my knowledge, I have no spokesman. At any rate the spokesman had "no comment" about the alleged "reports" whose source is not disclosed. Should a federal judge recuse on the basis of this type of "evidence"? I think not.

## VIII.

■ LRSD next argues that I committed some impropriety by having my law clerk obtain a list of the names and addresses of LRSD school principals so that the Citizens' Committee, which I had recently appointed to monitor the implementation of LRSD's Plan, could send questionnaires to the principals. When my law clerk arrived at the LRSD superintendent's office to pick up the list, which she had been told would be available when she arrived, she was confronted by a full staff of attorneys representing LRSD. After a lengthy and uncalled for interrogation by LRSD's attorneys, she was finally given the list. The list was a public document, available to anyone who asked for it, and I fail to see any impropriety in the Court's having obtained the list on behalf of the Committee. One of the primary responsibilities of the Citizens' Committee was to gather information pertaining to staff assignment. When the Court first appointed the Citizens' Committee, LRSD portrayed the Committee as an prosecutorial body, as opposed to a monitoring, advisory committee, and appeared to resent the Committee's requests for information. The request for the list of principals is just one example. On April 20, 1987, the Committee's counsel sent to LRSD a letter request for information about staff assignment. LRSD Board members stated at the Board's April 21st meeting that the Committee's request for information was unreasonable in that it would be impossible to furnish the information sought within two or three days, much less the following day. LRSD filed a Motion for Protective Order the next day, but a few hours later, furnished the Committee with the information it had requested. This action by LRSD demonstrates the absurdity of its argument that the Committee's requests for information require my recusal.

## IX.

■ Finally, LRSD argues that I should recuse because of a letter I wrote to a former member of the LRSD Board on April 1, 1987, in reply to a letter I received from her criticizing me for having made certain rulings in this case. LRSD contends that my letter to the former Board member demonstrates that I had prejudged the outcome of the April 29 hearing. By the time I wrote this letter dated April 1, of course, LRSD's attorneys had conceded in the March 27 hearing that LRSD had in fact violated my Orders. Since teacher assignments were not mailed out until April 10, nothing in that letter could have been referring to teacher reassignment, which is the subject of the April 29 hearing.

## X.

Paragraphs 6–10 of LRSD's Motion to Recuse contain a summary of an agreement between the Classroom Teachers Association and the LRSD. This is the first word I have heard about this agreement, which apparently was kept secret from me and some of the other parties in this case. I fail to understand how this secret agreement has any bearing on LRSD's Motion to Recuse unless, perhaps, it is offered to justify LRSD's violation of my Orders. It would indeed be a novel proposition that a contract of this nature, which has not even been presented in this litigation, could supersede the Order of a federal court.

## XI.

LRSD's Motion to Recuse represents a time-worn tactic in sports contests and trials. When the umpire or judge calls you for a flagrant violation of the rules, your response is not to offer a defense for your conduct but to attack the umpire or the judge.

The Motion to Recuse is denied.

EXHIBIT A

\*    \*    \*    \*    \*    \*

MR. SAMUEL JONES: I wrote part of this, not the first part, and I will read it all to the Court.

THE COURT: All right.

MR. SAMUEL JONES: The Pulaski District, as the Court knows, had intended to offer evidence in support of its proposed student assignment plan and to explain the factors that originally dictated the plan. We have all been well aware from the beginning of the hardships the plan would create from the standpoint of busing burdens. However, we have also been very conscious of the racial balance considerations and of the criticisms that have been made in the previous hearings about the degree of racial imbalance that previously existed in the Pulaski District schools.

We believed at that time as we set about the plan that it was imperative and as lawyers we advised the District to present a plan that would clearly satisfy this Court that the Eighth Circuit's racial balance guidelines had been complied with, if not exceeded.

The geography of the District, and the Court knows this well, and the locations of the black and white populations in our District make it extremely difficult, as we believe our evidence would show, to achieve the degree of racial balance we believed we had to set for ourselves without the lengthy bus rides the plan contemplated. The staff of the District struggled very hard to keep the busing to a minimum within those guidelines. It also worked very hard to make the busing burden as nearly equal as possible as between black and white children.

In addition to the geography we began with, your Honor, the Court is well aware that the Eighth Circuit determined it appropriate to transfer the Granite Mountain area to our District. And, of course, that area happens to coincide with the original concentration of black population we had in our District which we refer to now as the southeast quadrant.

Additionally, the Eighth Circuit's transfer of the territory from our District to Little Rock makes our efforts to achieve an enhanced level of racial balance districtwide even more difficult, and I am sure the Court appreciates that.

We are also very conscious that if a desegregation plan is to succeed it must have as much support as possible from the community. The meetings the staff has had with patrons made it very clear that the proposed plan does, indeed, have very strong opposition.

In light of the Court's statement of yesterday, the Pulaski District is withdrawing its proposed plan and will work speedily to be able to present a revised plan that reflects the suggestions the Court has made. The staff has already been at work these past several weeks to examine possible adjustments that might be made if the amount and distance of busing is required to be reduced.

In our further planning the staff expects to avail itself of the advice of Dr. Finis Welch, as well as any others who volunteer their services. Dr. Welch has been studying the proposed plan and was prepared to testify about it at this hearing and we will now redirect and re-channel his energies toward the development of an alternative.

The District welcomes the statement that the Court made yesterday and believes it will be very helpful in developing a revised plan that should have greater promise of success.

Now, if I could do now, your Honor, is try to explain right now something that I thought I wouldn't be explaining until in the morning. What we have tentatively done in the past twenty-four hours is take as a starting point what would result if we eliminated the long distance busing from the northwest and the northern part of the District to the south and that from the southeast north and to the southwest, that being the long bus routes that the plan contemplated. And just let me add, we have made a calculation in respect to that. This elimination alone will eliminate these

long distance bus rides for 1576 students both black and white.

Now, if this is done let me give the Court some information on what immediate impact that would have in various areas of the District, and I think the Court is sufficiently familiar with how the District is laid out that these shorthand descriptions I'll give will make sense to the Court.

Taking the southeast quadrant for starters, which now includes the Granite Mountain area; that's basically the area from the new Little Rock School District boundaries on the west to the Arkansas River and down to the County line of Jefferson County. And let me point out the figures I'm about to give the Court do not factor in any magnet participation or M to M transfers or any of the other devices we bring to bear in this case. But on average—not on average—the actual student population in that southeast quadrant if they went to those schools in that area and nowhere else would open at 55 per cent black at the elementary level, 51 per cent black at the junior high level, 50 per cent black at the high school level and that would be without busing those kids anywhere outside that quadrant.

Turning toward the west, and, of course, your Honor, that's basically the rest of our territory south of the Arkansas River, without any—just the kids who live there right now, at the elementary level the schools—the population for all of the elementary schools will be 12 per cent black, at the junior high level 10 per cent, at the senior high level 10 per cent.

Now, again, your Honor, that's without factoring in any magnet participation that would influence those numbers. That also, quite frankly, has not taken into account the loss of some of the white children who now attend Fair. What I am trying to do is give the Court absolute extreme ranges that we think would be better in the final analysis.

Now, we think these ranges will be influenced particularly at the Robinson Schools by an orchestrated effort we've been making for the last two weeks to persuade the children from the Pankey community to continue to attend the Robinson Schools and thus far we have met with a warm reception to that idea and we think we will succeed.

Another idea we have, and we want to visit with the Little Rock District about it, is to target the Romine area for interdistrict M to M transfers of black children from the Little Rock District to those schools in the western part of our District, and one of them, Baker Elementary, is very close to that area.

Now, turning north, and I'm just going to give you the averages, the averages in the north part of the District without any of the long distance busing give us a 23 per cent black elementary student population if we keep Bayou Meta isolated, and we believe there may be equitable ways to achieve a significant level of desegregation at Bayou Meta, and if we did that that would make the elementary wide average north of the river 21 per cent. It would be at 18 per cent at the junior high level, 16 per cent on average at the high school level.

Again, your Honor, these figures do not account for particularly white students from north of the river going to the magnet schools. Obviously, we are going to encourage that and that will be part of the plan we present to this Court on how we intend to target specific areas up there, and when that happens, obviously, the black proportion will go up in these schools.

Now then let me give you some specifics on how we think the magnet stipulation that we worked as hard as anybody else to get will influence the southeast quadrant. Right now all of the high school students whom we are receiving from Granite Mountain are assigned to Parkview. Parkview is going to become a magnet school. We think it certainly reasonable to anticipate that most, if not all, of those children would elect to continue at Parkview in a magnet setting, and our intention is to examine a manner of establishing preferences

for these kids in these communities so that the magnet—the dynamics of the magnet program can help reduce these proportions we have identified that would result if nothing else influenced them.

The same phenomena will be brought to bear, your Honor, at Mann. Many of the junior high students from the Granite Mountain area go to school at Mann right now, and under the seat allocation we get we know that all of them if they want to stay there can and we will still have at the secondary level, in particular, a lot of seats in the magnet schools that we can reserve for our black kids in the southeast quadrant.

And the same thing applies to the elementary students, particularly we have a lot of Granite Mountain kids who are presently going to Booker, and we think the same thing can happen there.

If these choices, magnet choices, and its a choice element of the plan are fully utilized then, obviously, these opening percentages I gave the Court would go down.

Your Honor, we've got to encourage something like that because we don't have room in the southeast quadrant to leave everybody there initially. We think the magnet choices will help a lot toward resolving that problem, but even if they were fully utilized it won't eliminate it. Now, we will eliminate that by '88–'89 because that's where we're going to build our new school, is in that community.

THE COURT: Aren't you going to lease a school down in that area?

MR. SAMUEL JONES: I am going to get to that. The Little Rock District has offered us Gilliam. Now, we're trying to figure out if Gilliam can be used at least on a temporary basis until we get our new school built, or just for a year. The preliminary analysis is, your Honor, that it would cost too much to bring it up to standards to be used hence into the future and that that money is better used on making the new school bigger. So we suspect we're going to be in a situation where we're going to have to accommodate, if we proceed in this fashion, the seat shortage through the use of the magnet choices, the M to M transfers; in our District we have an intradistrict program.

THE COURT: Well, I think the testimony was Gilliam has been built in the flood plain anyway, so if there's a flood I guess you would be in bad shape anyway.

MR. SAMUEL JONES: Yes, sir. If we can figure out how to build a levee around it, your Honor, or something like that, we may very well use it, but we think that is not likely to be the first choice. We think we are going to have to make do with a lot of portables if we proceed in this direction for one year because the problem is at the elementary level and not so much at the secondary.

THE COURT: Well, how long do you want to submit your substitute plan?

MR. SAMUEL JONES: I am going to get to that.

THE COURT: All right. Go ahead.

MR. SAMUEL JONES: Okay. I am almost through, your Honor.

I wanted to explain, though, to the Court some of the benefits financially we could derive from reducing the busing and particularly eliminating the long bus routes. We don't have figures we're comfortable giving the Court yet except to say that if we eliminated these long distance bus routes I described at the outset, we have an initial savings of several hundred thousand dollars and an annual savings in excess of a hundred thousand dollars and perhaps approaching two hundred thousand dollars a year, year in and year out.

If we proceed in this fashion what we propose to do is earmark that money and some other monies I'll explain to enhance the compensatory education programs we originally proposed to establish in these schools regardless. That would free-up, in effect, new money that we wouldn't be driving around in buses and we would dedicate it to those programs.

Additionally, one of the benefits of our kids aggressively making magnet choices is that generates the incentive payments from the State to the District which could theoretically amount to several hundred thousand dollars, and we believe we would also be in a position, and I suppose that's on an annual basis as well, we believe we would be in a position to earmark that money for the compensatory education programs at these schools.

One could say that the elimination of busing these children out of that quadrant to the west would be that more of them would be remaining in these schools to receive the compensatory education program than would otherwise if we were busing a lot of them out of there. And we think in a real sense that that could be a benefit of eliminating the long distance busing under this plan.

Your Honor, I want to mention a couple other features. If we proceed in this direction we think we will have to develop some strategies and devices to prevent these schools from reaching the point of being in danger of being resegregated. We are not prepared—we don't want to present that evidence until we have consulted with a lot of experts about it, and I just wanted to mention to the Court that we are aware that that's something we think would have to be done.

One of the present devices we do know about, and I've mentioned it before, is our intradistrict M to M program, and what we're examining, also, your Honor is if we can actually implement some form of control choice, probably not districtwide but in selected areas to incorporate into our plan, but we are not far enough down the pike to give the Court any details on that right now.

Let me just say, your Honor, that if you think in what I have been able to tell you and given the Court's own knowledge about what kind of geographics and demographics we're looking at from now on, if you believe that we've got our ship on course, we're prepared to proceed as outlined and present the full plan to this Court, together with actual student assignments, two weeks from tomorrow.

Your Honor, just like everybody else in this case we're seeking calmer waters and we believe that the successful pursuit of the Magnet stipulation shows that this District has the ability to forge compromises in this case and to work with all of the parties toward ending this litigation, and have everybody get on with the task of properly educating all of our children in this District.

If the Court believes we're back on track we would like to know so that we can meet our proposed timetable of two weeks from tomorrow. We would like to be able to do this, your Honor, before the election, because we think an alternative along the lines we've outlined gives us a real chance to pass our millage and if we can do that, that's even more money we could apply to compensatory education.

I haven't had a real opportunity, your Honor, to discuss this in any detail with the Intervenors or with the Little Rock District, but we certainly want to involve them in this process.

THE COURT: Well, thank you, Mr. Jones.

\*　　\*　　\*　　\*　　\*　　\*

### SUPPLEMENTAL ORDER

■ The Joshua Intervenors have moved for my recusal alleging, *inter alia*, the "participation" of my former law firm in *Clark v. Board of Educ. of the Little Rock School District*, LR–64–C–155. The *Clark* case is currently in a closed status, as it was at the time Judge Overton and I signed the consolidation order. There has been no activity in *Clark* since the consolidation. While the "participation" in *Clark* by my former law firm was extremely attenuated (and, interestingly, at the request of the counsel now complaining), I have decided the *Clark* case should be severed from the consolidated cases herein, and returned to Judge Overton's docket.

The severance should obviate any question as to my continuing to sit on the

remaining consolidated cases. *See Patterson v. Masem*, 774 F.2d 251, 254 n. 2 (8th Cir.1985) where counsel for Joshua Intervenors unsuccessfully raised this same contention. Further, the fact that these cases were consolidated for a month in no way taints the remaining consolidated cases even assuming, *arguendo*, that the *amicus curiae* status in *Clark* would require recusal under 28 U.S.C. § 455(b)(2). In *United States v. Altman*, 750 F.2d 684, 695 (8th Cir.1984), the Eighth Circuit held:

> Consolidation does not merge lawsuits into a single action, "or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson v. Manhattan Railway Co.*, 289 U.S. 479, 496–97, 53 S.Ct. 721, 727–28, 77 L.Ed. 1331 (1933). This court has previously recognized that *consolidation does not destroy the independent status of the cases consolidated* and does not deprive the litigants of the right to consideration of their individual claims. (emphasis supplied).

The other grounds raised by the Joshua Intervenors in their motion were dealt with in my Order of April 30, 1987, and need not be repeated here.

Accordingly, *Clark* is hereby severed and returned to Judge Overton's docket. The motion to recuse is denied.

This 6th day of May, 1987.