Scotty GRUBBS, et al.

v.

Christine BRADLEY, et al.

Nos. 80–3404, 80–3578, 80–3581, 80–3616, 80–3617, 3–84–0256 and 3–88–0284.

United States District Court, M.D. Tennessee, Nashville Division.

May 14, 1993.

497

Gordon Bonnyman, E. Clifton Knowles, Bass, Berry & Sims, Nashville, TN, for plaintiffs.

John Lee Kennedy, James L. Charles, Metropolitan Legal Dept., Nashville, TN, for intervenors.

Charles W. Burson, Atty. Gen. and Reporter, Charles Everett Robinson, Asst. Atty. Gen., David Clare Kipp, Dobson & Johnson, Nashville, TN, for defendants.

## MEMORANDUM

HIGGINS, District Judge.

This matter is before the Court on the various reports of the Special Master and the objections of the parties, all of which relate to the termination of this litigation pursuant to the order entered November 9, 1987 (Docket Entry No. 510), and the defendants' motion (filed September 5, 1991; Docket Entry No. 724) to vacate remedial orders and to terminate this litigation.

The Court is now called upon to evaluate whether the legitimate constitutional objectives of this litigation have been achieved, and determine whether the Court should terminate its supervisory control over the state prison system.

### I.

At a trial on the merits in 1981, the inmate plaintiffs in this class action sought injunctive and declaratory relief related to constitutional challenges to the conditions of confinement at various Tennessee Department of Correction (TDOC) adult penal institutions. In 1982, the Court issued a memorandum opinion and order which held that seven (7) prac-

tices and conditions of confinement at TDOC's facilities violated the Eighth Amendment to the United States Constitution. *Grubbs v. Bradley*, 552 F.Supp. 1052, 1131–32 (M.D.Tenn.1982).

In addition to the seven original 1982 orders, the Court also has issued other remedial orders in this case. Some of the more significant of these orders pertain to: (1) inmate population capacities for TDOC facilities and (2) the *Grubbs* matrix plan and timetable, which was a comprehensive evaluation containing approximately 1,584 specific remedial recommendations and served as an operational guide for TDOC. In 1987, this Court directed that the accomplishment of the remedial orders of the Court be completed by June 30, 1992. *See* Docket Entry No. 510.

The defendants' efforts to remedy the unconstitutional conditions found by the Court in 1982, and comply with the other remedial orders of the Court have been an ongoing process. This class action has now been in litigation for well over ten (10) years, and it has been four (4) years since the Court accepted and approved the matrix plan and timetables. The record in this action demonstrates the dramatic, proven progress the defendants have made in operating Tennessee's correctional facilities.

There was a time in the not too distant past when a former warden of the Tennessee State Penitentiary bragged publicly that all that was required to run a penitentiary in Tennessee was a "shotgun, a strap and a checkbook."

There can be no doubt that the shocking conditions which existed at that time in the Tennessee prison system, and at the time this litigation was first instituted in the state court and later in this Court, do not exist today.

The Tennessee prison system today is an altogether new and completely rehabilitated system. This turn around is due to the leadership of former Governor Alexander who responded promptly to the orders the Court issued in October, 1985, and to the extraordinary "hands on" leadership of Governor McWherter and his administration and the two Commissioners, Messrs. Norris and Reynolds, who oversaw the day-to-day implementation of the Court's remedial orders. Finally, credit is due to the men and women in the ranks who worked to change the system and today can take pride in what they helped to bring about: a humane and constitutional prison system.

## II.

The record in this case demonstrates that in the last ten (10) years the defendants have made dramatic improvements in the major areas of concern in the *Grubbs* litigation. *See* Docket Entry No. 686 at 2—memorandum opinion of the Court entered August 16, 1990. Policies and procedures have been developed and implemented by TDOC which evince the defendants' institutional commitment that these correctional advances will be maintained. *See* May 15, 1992, transcript of proceedings at 113–17. As the Court noted at the May 15, 1992, hearing in this case, "[a]bsent some direct effort to dismantle the system, ... there [is] a wholehearted commitment on the part of the [defendants] to run a good system." *Id.* at 140. As is noted below in more detail, the defendants have expended during this litigation considerable time, energy and money to comply with the original directives of 1982, and other remedial measures of the Court in this case.

The Court finds that the defendants have complied with the remedial orders of the Court in this case with one relatively significant exception. *See* May 1, 1992, Report of the Special Master Regarding the Defendants' Compliance With The Court's Orders at 31 (Docket Entry No. 745). Generally, with regard to the Tennessee prison system as a whole, the Court finds that the housing provided at TDOC facilities, which is the subject of this litigation, is constitutionally adequate. The Court also finds that the sanitation conditions at TDOC facilities pertaining both to living units and food storage, service and preparation are constitutionally adequate. With respect to personal safety, the Court finds that the risk of violence that existed in the early 1980s has been remedied by TDOC through a variety of measures. The Court further finds that the system of

health care delivery to TDOC inmates is constitutionally adequate except as to a quality assurance plan. In addition, the Court finds that the specific goals set forth in the *Grubbs* matrix have been substantially satisfied.

### III.

Five (5) of seven (7) of the unconstitutional conditions found by the Court in August, 1982, were institution specific, and not systemic constitutional violations. The record in this case reflects the defendants' compliance in remedying the four (4) institution specific confinement conditions pertaining to housing, sanitation, environmental conditions, and exercise. The fifth institution specific violation regarding personal safety will be discussed below, as will the two (2) systematic violations regarding classification and health care delivery.

### A.

Based on the record in this case, the Court finds that the institution specific conditions pertaining to housing, hot water, sanitation and exercise are constitutionally adequate. Since the issuance of the Court's order dated October 11, 1982, the Court has certified the defendants' compliance with respect to the use of Guild 17 at the Nashville Regional Correctional Facility; provision of hot water at D Block at the Brushy Mountain State Penitentiary and Guild 17; renovation and use of D Block at Brushy Mountain; and renovation of the Main Building at Nashville Community Service Center. *See* Docket Entry No. 292(a). Single celling at the Tennessee State Penitentiary (TSP), Units I–IV, was accomplished on August 2, 1985. *See* Docket Entry Nos. 331, 335 at 3–4. With respect to single celling at Guild 17, the unit was razed on April 16, 1984. *See* Docket Entry No. 291(c). Although not addressed in a subsequent order of the Court, TDOC remedied the unconstitutional condition regarding exercise by promulgating TDOC Policy No. 506.16(VI)(B)(4), which affords segregated inmates exercise periods. Also, the Court previously concluded that the defendants' plan to remedy the sanitation procedures in the food storage, preparation and

service areas at TSP, Fort Pillow Prison and Farm, and Brushy Mountain was constitutionally adequate. *See* Docket Entry No. 292(a).

### B.

In 1982, the Court determined that TDOC's classification function was a systemic deficiency in Tennessee's prisons. *Grubbs, supra*, 552 F.Supp. at 1060. Classification was considered by the Court to be one of the likely causes of violence in Tennessee's prisons. *Id.* at 1128. Pursuant to the May, 1992, Compliance Report of the Special Master in this action, the Court finds that the problems in inmate classification noted by the Court in 1982 have been essentially remedied, and that "[o]verall, TDOC has come very close to having an exemplary classification system." Compliance Report at 5–6.

### C.

The Court also determined in 1982 that the delivery of health care amounted to a systemic deficiency in Tennessee's prisons. *Grubbs, supra*. Based on the record in this case, the Court now finds that the deficiencies in health care noted by the Court in 1982 has been remedied in substantial part. It is apparent that the Lois DeBerry Special Needs Facility will meet the medical and mental health needs of the Tennessee prison system. Tr. at 50–51, 52–57. None of the health care staff at the Special Needs Facility will be required to oversee security. Tr. at 71. Other than the necessary inmate work cadre, inmates will not be housed at the Special Needs Facility who do not have medical or mental health care needs and who do not meet the admissions criteria for the Facility. Tr. at 52, 72, 94–98. In addition to the Special Needs Facility, the defendants have been successful in substantially improving the overall quality of health care to TDOC inmates. *See* May 8, 1992, deposition of Dr. Wilfred Rabindranat (Rabi deposition) at 61–62 [this deposition was introduced as plaintiffs' Exhibit A at the May 15, 1992, hearing in this case]. All TDOC facilities now have twenty-four hour emergency coverage. Tr. at 77. Inmates are no longer being

used to deliver medical services at TDOC's facilities. *Id.* at 78. All TDOC facilities have adequate in-house medical staff as well as the capability to contract for appropriate health care services. Rabi deposition at 84–85; Tr. at 122–125, 127–129 and defendants' collective Exhibit 1 [Spencer letter dated July 5, 1990].[1]

The reports (Docket Entry Nos. 745 and 772) of the Special Master on defendants' compliance with the Court's orders reflect one glaring deficiency in the area of health care. In his 1982 opinion, Judge Morton put his finger directly on the pervasive problems of a dysfunctional management structure for the prison health care system. In doing so, he stated:

> ... There is no functioning program or device to assure the maintenance of quality control in the delivery of health care to inmates. Recommendations for quality assurance mechanisms have come from several sources over the years, and Mr. Brodie [then Director of Health Services] himself views quality assurance as "absolutely essential." Yet, in the absence of a quality assurance program, the evidence indicates that nurses routinely perform functions beyond the level of their license or certification, former military medics are used interchangeably with nurses without apparent regard to the individual's actual qualifications, and staff remain largely unaccountable for the level or quality of care actually delivered.

*Grubbs, supra,* 552 F.Supp. at 1068.

For reasons that are inexplicable to the Court, despite discussions in open Court and in chambers, the state defendants resisted the help and urgings of the Special Master[2] and the consultant for medical care matters toward putting in place a quality assurance plan that would deal with the systemic deficiency in the delivery of health care in the Tennessee prison system. *See generally* Response of the Defendants to April [sic] 1992 Compliance Report of the Special Master, filed May 6, 1992 (Docket Entry No. 746).

The Court views the necessity for an appropriate quality assurance plan as indispensable and not unduly intrusive in remedying the systemic deficiency found to exist by Judge Morton.

Accordingly, in accordance with the holding *Freeman v. Pitts,* —— U.S. ——, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), the Court will retain jurisdiction in this discrete area. The Court accepts the defendants' plan for quality assurance, as reflected in the correspondence and other documents attached as Appendix B to the Supplemental Report of the Special Master, filed November 6, 1992 (Docket Entry No. 772). The defendants will be required to engage in a one-year period of self-monitoring and self-reporting with regard to reports of quality assurance activities, findings and corrective actions. These reports shall be furnished to lead counsel for the plaintiff class during the one-year period.

### D.

The fifth institution specific condition of confinement that was found to be unconstitutional in 1982, pertained to personal safety. In 1982, the Court concluded that the defendants' inability to control violence and protect inmates at three (3) TDOC facilities amounted to cruel and unusual punishment in violation of the Eighth Amendment. *Grubbs, supra,* at 1078–81, 1091–92, 1101–02, 1128, 1132. The Court indicated that the causes of prison violence included, among other things, overcrowding. *Id.* at 1128. The Court finds that the defendants have attempted in good faith to address through a variety of measures the overcrowding problems which existed in the early 1980s. *See also Carver v. Knox County, Tenn.,* 887 F.2d 1287, 1291 (6th Cir.1989) (record in *Grubbs*

---

**1.** *But see* the letter of Dr. Spencer, dated April 19, 1992, attached as Appendix A to the Report of the Special Master, filed May 1, 1992 (Docket Entry No. 745) and letter of Dr. Spencer, dated October 28, 1992, attached as Appendix A to the Supplemental Report of the Special Master, filed November 6, 1992 (Docket Entry No. 772).

**2.** The Court delayed the closing of this case in the summer of 1992 for the express purpose of attempting to resolve the issue of a quality assurance plan. Finally, in the fall of 1992, the Court directed the Special Master to involve himself in the matter and bring in the necessary medical consultant and file a supplemental report on this subject.

case demonstrates that Tennessee's legislative and executive branches of government are making sincere efforts to deal with its felon population demands). These measures include construction of six (6) new prisons, new community programs, contracting with local governments, new parole policies, and new sentencing legislation. In addition, the TDOC still has projects to bring on line over the next fifteen to eighteen months an additional capacity of 1,014 beds at its three new medium security facilities. Tr. at 86–87. The defendants have expended approximately $300 million over the last several years in an effort to address increases in the felon population. Tr. at 87. New sentencing reform and other legislation is part of the defendants' comprehensive approach to meet Tennessee's felon population demands. Tr. at 88, 98–105. The defendants continue to develop community corrections and intensive probation programs as alternatives to incarceration for felons. Tr. at 105–106. Parole has contributed to the defendants' ability to manage the felon population. Tr. at 106–107. Contracts with local governments to house felons is yet another means by which the defendants have dealt with Tennessee's felon population demands. Tr. at 107–108.

The Court further notes that the risk of violence in the early 1980's has been remedied to an adequate level by the defendants through a variety of inmate programs to reduce idleness of inmates. In accordance with the Compliance Report, the Court finds that most of the deficiencies found in the area of academic and vocational education programs have been remedied. Compliance Report at 8–10. Additionally, inmate job programs designed to reduce inmate idleness also have reduced the risk of inmate violence. Compliance Report at 12–13.

### IV.

In accordance with the Compliance Report, the Court finds that the specific goals set forth in the *Grubbs* matrix have been achieved for all effective purposes. The defendants have fully complied with all but a

very few of the approximately 1,200 separate evaluator recommendations dealing with security and institutional environment, either as they were originally made, or through the adoption of acceptable alternatives. Compliance Report at 13. Nearly all of the recommendations which required construction or other modification of physical structures have been completed. *Id.* Those recommendations which required procedural changes also have been adopted, usually by inclusion into TDOC policies and procedures or institutional post orders. *Id.* at 13–14.

With respect to specific matrix items, the Court also finds that the defendants have complied with the three major structural requirements called for by the remedial process. These requirements include: (1) the elimination of the Tennessee State Penitentiary as a facility for housing inmates;[3] (2) the opening of a secure medical and mental health facility; and (3) the implementation of a new computer system (the Tennessee Offender Management Information System [TOMIS]).

With respect to the *Grubbs* matrix, the Court finds that the defendants' compliance efforts fully satisfy the intended remedial purpose of the matrix.

### V.

All of the institutions under the remedial orders of *Grubbs* have achieved accreditation from the American Correctional Association (ACA) [except Tennessee State Penitentiary and DeBerry Correctional Institution, which have been closed], indicating that these and other TDOC facilities meet recognized professional standards for operation. Since 1984, TDOC has engaged in the process of obtaining accreditation for its facilities from ACA. Tr. at 111–13; defendants' collective Exhibit 3. As of the date of the May 15, 1992, hearing in this case, fifteen of TDOC's facilities had been accredited by ACA. Tr. at 112. The Court especially notes that on June 3, 1992, the Fort Pillow Prison and Farm successfully completed its ACA audit. Further, the Court especially notes that Fort

---

**3.** On June 16, 1992, the last inmate was moved out at 1:10 p.m. and the Tennessee State Penitentiary was officially closed. *See* Supplemental

Report of the Special Master, filed July 8, 1992 (Docket Entry No. 754).

Pillow's formal accreditation will be awarded at a later date. To date, ten TDOC facilities have come up for reaccreditation, and all have been successful. *Id.* Obtaining accreditation for TDOC's remaining facilities and reaccreditation for all facilities represents a continuing commitment of TDOC to proper management of the prison system. In addition to the ACA accreditation process, TDOC also performs annual inspections at its facilities. The TDOC annual inspection process covers a wide range of correctional activities and services, from food service to health care delivery.

The Special Master, in his May, 1992, Compliance Report, raised concerns regarding the use of guild "connectors" at TDOC's regional correctional facilities. Compliance Report at 28–32. Upon review of the evidence presented by the defendants in response to the Special Master's Report regarding guild connectors at the regional facilities, the Court finds that the use of guild connectors at these regional facilities does not raise a constitutional issue as to any greater risk to the safety and security of the operations at the facilities or to the inmates and staff. The wisdom or lack of wisdom in using such "connectors" and on which shifts is a matter for the managers of the prison system.

In the Compliance Report, the Special Master raised concerns regarding " 'split management' for education, food service, health care delivery, or other programs at two or more institutions." Compliance Report at 27–28, 31–32. At the May 15, 1992, hearing in this case, the Special Master advised the Court that he would attempt to resolve before June 5, 1992, his own concerns regarding this internal management issue without engaging the Court in this matter. Tr. at 120–21, 146. The Court is advised that TDOC has resolved the concerns of the Special Master regarding this internal management issue.

## VI.

■ With respect to conditions of confinement, the Eighth and Fourteenth Amendments to the United States Constitution prohibit the states from imposing cruel and unusual punishment on their incarcerated felons. *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Eighth Amendment requires states to furnish incarcerated felons with reasonably adequate food, clothing, shelter, sanitation, medical care and personal safety. *Grubbs,* 552 F.Supp. at 1052.

■ Deliberate indifference by prison officials to the conditions of confinement of incarcerated felons constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Wilson v. Seiter;* —— U.S. ——, ——, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271, 281–82 (1991). The Constitution prohibits only those deprivations denying the minimal civilized measure of life's necessities which are sufficiently grave to form the basis of an Eighth Amendment violation. *Id.* at ——, 111 S.Ct. at 2324.

■ Wide-ranging deference must ordinarily be accorded the decisions of prison administrators. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629, 639 (1977); *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224, 236 (1974). Absent a clear finding of constitutional violations, federal courts simply will not interfere with the state's administration of its prison system. *Johnson v. Avery,* 382 F.2d 353, 355 (6th Cir.), *rev'd on other grounds,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Even when a violation is found, federal court intervention into state operations will go no further than required to ensure compliance with federal law. *See Rizzo v. Goode,* 423 U.S. 362, 378–80, 96 S.Ct. 598, 607–09, 46 L.Ed.2d 561, 573–75 (1976). Federalism requires that remedies for constitutional conditions of confinement in state prisons take into account the state's strong interest in operating its own prison system. *See Id.* A federal court exceeds its authority if it imposes remedial requirements that are not required to respond to a constitutional violation. *See Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 434–35, 96 S.Ct. 2697, 2704, 49 L.Ed.2d 599, 607 (1976).

■ Once properly imposed, federal court remedial decrees affecting state programs should be modified or dissolved ·as necessary to ensure that they do not unduly burden or restrict the constitutional prerogatives of a state. *See Board of Educ. of Oklahoma City v. Dowell,* 498 U.S. 237, 245–49, 111 S.Ct. 630, 636–37, 112 L.Ed.2d 715, 727–29 (1991). In particular, federal court remedial decrees should be terminated altogether once a court finds that constitutional requirements are being met and that defendants are unlikely to "return to [their] former ways." *Id.,* 498 U.S. at 247–49, 111 S.Ct. at 637, 112 L.Ed.2d at 728. Compliance with previous court orders, as well as good faith efforts by defendants, are obviously relevant in deciding whether to modify or dissolve a federal court remedial decree. *Id.* Federal court remedial decrees that affect state agencies and functions "are not intended to operate in perpetuity," thereby subjecting a state to its own particularized set of constitutional requirements. *Id.* Federal supervision is intended as a temporary measure to remedy past violations. *Id.*

■ Indeed, emphasizing the importance of minimizing federal court supervision of state programs, the Supreme Court of the United States recently held that federal court decrees can be terminated in stages. *Freeman v. Pitts,* —— U.S. ——, —— –——, 112 S.Ct. 1430, 1445–46, 118 L.Ed.2d 108, 133–34 (1992). In ordering partial withdrawal, a court should consider whether there has been full compliance as to factors withdrawn· from supervision; whether retention of judi-

cial control is necessary to achieve compliance as to other factors; and whether defendants have demonstrated a good faith commitment to fulfilling the decree. *Id.*

### VII.

■ Applying these legal principles to the facts of the present case, the Court holds that, with the exception noted below, all outstanding remedial orders [4] and injunctive relief in this case shall be vacated and dissolved and shall have no further force and effect upon entry of the judgment in this litigation. The Court further holds that the supervisory authority of the Court over this case shall be terminated forthwith except for the one-year period of self-monitoring and self-reporting with respect to the quality assurance plan in the area of health care. The Court concludes that the *Grubbs* prisons which are under review in this case include only those TDOC facilities which have wardens who are party defendants in this case in their official capacity. The Tennessee prisons covered by this litigation are operating within constitutional requirements as reflected by the findings of fact and conclusions of law set forth in this memorandum. Furthermore, the Court's extended experience with this litigation convinces the Court that the defendants have the commitment, operating structure and skills necessary to continue operating the prison system in accordance with constitutional requirements. Due to these conclusions, the prospective application of this Court's remedial authority in the area of

---

4. Included in the orders being vacated are all interlocutory orders regarding capacity levels or "caps" on population at the various penal institutions involved in this litigation. In the. recent opinion in *Wilson v. Seiter,* 501 U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), the Supreme Court stated that a prison condition, such as overcrowding, is not unconstitutional unless it, "alone or in combination" with another condition, "produces the deprivation of a single, identifiable human need such as food, warmth, or exercise...." *Id.* 501 U.S. at ——, 111 S.Ct. at 2327, 115 L.Ed.2d at 283. The Court of Appeals · for the Ninth Circuit stated the proposition very clearly, "Overcrowding itself is not a violation of the Eighth Amendment. It can, under certain circumstances, result in specific effects which can form the basis for an Eighth Amendment violation." *Hoptowit v. Ray,* 682 F.2d 1237,

1249 (9th Cir.1982). The Supreme Court cited *Hoptowit* with approval in *Wilson v. Seiter,* 501 U.S. at ——, 111 S.Ct. at 2327, 115 L.Ed.2d at 283.

The Supreme Court has also held that double celling is not an unconstitutional practice. *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59, 69 (1981). Accordingly, the Court declines the invitation of the plaintiff class to impose, by way of permanent injunctive relief, any "caps" or capacity levels on population, or limitations in double celling. If the past, present and future officials of the State · of Tennessee have not learned a Three Hundred Million Dollar ($300,000,000) plus lesson in this litigation, then further instruction is hopeless, and the solution will have to be left to another day and another lawsuit.

determining capacity levels for the various penal institutions would unnecessarily restrict the constitutional prerogatives of the State of Tennessee and would thereby infringe on well established principles of federalism.

■ The Court concludes that a permanent injunction with respect to the housing of inmates in the Tennessee State Penitentiary should be entered. The old penitentiary facilities are not constitutionally suited to provide housing for inmates. Accordingly, the Court will enter a permanent injunction prohibiting the use of the penitentiary facilities for housing inmates. This permanent injunction does not prohibit the Honorable Ned Ray McWherter, Governor of the State of Tennessee, and Ms. Christine Bradley, Commissioner of the Tennessee Department of Correction, in their official capacities, and their successors in office in their official capacities, from using the old penitentiary site, and the physical plant facilities and buildings on the site, for other purposes at some point in the future so long as inmates are not housed in such facilities.

## VIII.

The Court compliments the attorneys for the lawyer-like fashion, in the highest and best tradition of the Bar, in which this litigation has been conducted. The compliments of the Court are extended to Mr. Gordon Bonnyman, lead counsel for the plaintiff class, and to Mr. W.J. Michael Cody, former Attorney General and Reporter, and to the present Attorney General and Reporter, Mr. Charles W. Burson, and their respective colleagues.

Finally, the Court expresses its profound appreciation and gratitude to Mr. Patrick D. McManus, for his services as Special Master. Mr. McManus brought to his position as Special Master not only enormous experience in the field of corrections, but also a background of integrity and forthright dealing. In large part, the success of the vast institutional reform that took place in this litigation rests with Mr. McManus. He may be justly considered the father of the new Tennessee prison system.

An appropriate order will be entered.

## ORDER

In accordance with the memorandum contemporaneously entered, the Court finds, with the exception noted, that the defendants are in compliance with all of the remedial orders entered in this litigation, and the prison facilities which are under review in this litigation are operating within constitutional requirements.

The defendants, Governor McWherter and Commissioner Bradley, in their official capacities, and their successors in office in their official capacities, and their agents, servants and employees, and all other persons in active concert or participation with them, are permanently enjoined from housing inmates, under any circumstances, at the Tennessee State Penitentiary.

The defendant, Christine Bradley, Commissioner of Corrections, in her official capacity, and her successors in office in their official capacity, are hereby permanently enjoined to maintain in place a quality assurance plan related to the delivery of health care in the Tennessee prison system as reflected in the correspondence and other documents attached as Appendix B to the Supplemental Report of the Special Master, filed November 6, 1992 (Docket Entry No. 772), or its essential equivalent.

The defendant, Christine Bradley, Commissioner of Corrections, in her official capacity, and her successors in office in their official capacity, shall require the Tennessee Department of Correction to engage in a one-year period (from the date of entry of this order on the docket) of self-monitoring and self-reporting in accordance with the quality assurance plan, provided for above, with regard to reports of quality assurance activities, findings and corrective actions. These reports shall be furnished on a monthly basis to lead counsel for the plaintiff class during the required one-year period.

All remedial orders and injunctive relief heretofore entered on an interlocutory basis are herewith vacated and dissolved.

The supervisory control of the penal institutions involved in this litigation is terminated and returned to the officials of the State of Tennessee.

The Special Master, Mr. Patrick D. McManus, will be discharged thirty (30) days from the date of entry of this order on the docket in order to give him time to wind up the affairs of his office and organize the files in his possession to be delivered to the Clerk of the Court.

Again, the Court expresses its profound appreciation to Mr. McManus for his services as Special Master in this litigation.

The Court retains jurisdiction for the purpose of enforcing the judgment entered in this litigation.

The entry of this order shall constitute the judgment in this litigation.

It is so ORDERED.